## MOIR et al. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, First Circuit. March 29, 1926.)

No. 1863.

1. Trade-marks and trade-names and unfair competition ⊗➔80½, New, vol. 8A Key-No. Series—Court should not weigh conflicting evidence, but should determine whether fact findings of Federal Trade Commission are supported by substantial evidence (Federal Trade Commission Act, § 5 [Comp. St. § 8836e]).

Court should not weigh conflicting evidence, but should determine whether findings of fact by Federal Trade Commission, in proceeding under Federal Trade Commission Act, § 5 (Comp. St. § 8836e), are supported by any substantial evidence.

2. Trade-marks and trade-names and unfair competition ⊗➔80½, New, vol. 8A Key-No. Series.

Whether acts constitute unfair method of competition, within Federal Trade Commission Act, § 5 (Comp. St. § 8836e), is question of law for court.

3. Trade-marks and trade-names and unfair competition ⊗➔68.

It is not necessary that practice complained of should have become general, to make it unfair method of competition, within Federal Trade Commission Act, § 5 (Comp. St. § 8836e).

4. Trade-marks and trade-names and unfair competition ⊗➔80½, New, vol. 8A Key-No. Series—Federal Trade Commission would not be justified in relying on mere promise to discontinue unfair methods of competition (Federal Trade Commission Act, § 5, [Comp. St. § 8836e]).

Without imposition of some legal restraint by courts not to continue unfair methods of competition, within Federal Trade Commission Act, § 5 (Comp. St. § 8836e), Federal Trade Commission would not be justified in relying on mere promise to discontinue such practices.

5. Trade-marks and trade-names and unfair competition ⊗➔68—System of merchandising, whereby resale prices were maintained by co-operating with customers and salesmen, by agreement, and refusing to sell to price cutters, held unfair method of competition (Federal Trade Commission Act, § 5 [Comp. St. § 8836e]).

System of merchandising, whereby large sellers of tea and coffee to wholesalers and retailers maintained minimum resale prices with co-operation of customers and salesmen, by agreements, express and implied, with customers, and by refusing to sell to price cutters, held unfair method of competition, within Federal Trade Commission Act, § 5 (Comp. St. § 8836e).

6. Trade-marks and trade-names and unfair competition ⊗➔80½, New, vol. 8A Key-No. Series—Federal Trade Commission held not required to make specific finding that its complaint, charging unfair competition, is in public interest (Federal Trade Commission Act, § 5 [Comp. St. § 8836e]).

In absence of evidence that Federal Trade Commission acted arbitrarily in exercising its discretion to bring complaint charging unfair competition under Federal Trade Commission Act, § 5 (Comp. St. § 8836e), bringing of complaint is sufficient proof that it was brought in public interest, and no specific finding thereon is necessary.

Petition to Review an Order of the Federal Trade Commission.

Petition by John Moir and others, co-partners under the firm name and style of Chase & Sanborn, to review an order of the Federal Trade Commission commanding them to cease and desist from certain unfair methods of competition. Order affirmed.

Edmund A. Whitman, of Boston, Mass. (Elder, Whitman, Weyburn & Crocker, of Boston, Mass., on the brief), for petitioners.

Alfred M. Craven, of Washington, D. C. (Bayard T. Hainer, of Washington, D. C., on the brief), for respondents.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. This is a petition to review an order of the Federal Trade Commission upon a complaint issued by it, dated April 2, 1924, against the respondents, eight in number, copartners under the firm name and style of Chase & Sanborn, with their principal office and place of business in Boston and a branch office in the city of Chicago, in the state of Illinois, under the provisions of chapter 311, § 5, of the Federal Trade Commission Act, approved September 26, 1914 (U. S. Comp. Stat. § 8836e).

The complaint charged that they were engaged in the sale of coffees and teas to wholesale and retail dealers located in various states of the United States, and caused these commodities to be transported to them at their respective places of business; that in the course and conduct of their said business the respondents are in competition with other individuals, partnerships, and corporations similarly engaged in the sale of coffees and teas in interstate commerce and with the trade generally; that in the conduct of their aforesaid business the respondents have enforced and still enforce a system of merchandising whereby they fix and maintain certain

specified uniform prices at which the commodities sold by them to their customers shall be resold; that they enlist and secure the support and co-operation of wholesale and retail dealers and of their officers, and of respondents' officers, agents, and employees, in enforcing their said system; that among the means employed by them to accomplish the purpose of preventing retail dealers handling their products from selling the same at prices less than the resale prices established by respondents, they have adopted the following:

"(a) Respondents fix uniform minimum prices at which retail dealers handling respondents' said products shall resell same to the purchasing public, and issue and send to dealers handling said products price lists in which said uniform minimum prices are set forth.

"(b) Respondents make it generally known to the trade, by letters, circulars, salesmen's interviews, and by other means, that they expect and require retail dealers handling said products to maintain and enforce said minimum resale prices, and that respondents will refuse to further sell and supply said products to dealers failing to maintain and enforce said prices.

"(c) Respondents enter into agreements, understandings, and arrangements with dealers for the maintenance by them of said resale prices as a condition of opening accounts with such dealers, or of continuing their supply of said products.

"(d) Respondents procure from dealers handling said products reports of the failure of other dealers handling same to observe and maintain said resale prices, and reports of sales by dealers to other dealers who fail to maintain said prices.

"(e) Respondents employ their salesmen and other agents and employees to ascertain, investigate, and secure information as to the failure of any dealer to observe and maintain said resale prices, and as to the sale of said product by dealers to other dealers who fail to maintain said prices.

"(f) Respondents seek and secure the co-operation of dealers handling their said products, and of respondents' agents and employees, in preventing dealers who fail to maintain said process from obtaining said products from other dealers, and to that end have traced, and have caused said persons co-operating with them to trace, and identify, through information secured from freight-station agents, draymen, and others engaged in transporting said products, and in other ways, dealers from whom other dealers who fail to maintain said prices secure respondents' said products.

"(g) Respondents use the information received through the means set out in specifications (d), (e), and (f), or by any means, to induce and coerce dealers who fail to observe said prices, or who sell to others who fail to observe said prices to maintain said prices in the future, or to refrain in the future from selling said products to dealers who do not maintain said prices, by exacting promises and assurances from said dealers that they will in future maintain said prices or refrain from so selling, and by threatening said dealers that, if they do not maintain said prices or refrain from so selling, respondents will refuse to further supply them with said products.

"(h) Respondents refuse to further supply with said products dealers who offend in either of the particulars set out in the specification, unless and until such offending dealers have given satisfactory assurances or undertakings that they will in future observe and maintain said prices, or will refrain from selling said products to dealers who do not observe and maintain said prices.

"(i) Respondents use other equivalent co-operative means and methods for the enforcement of said system of resale prices."

The complaint further alleges that the direct effect and result of the acts and practices of the respondents have been to suppress competition among retail dealers in the distribution and sale of respondents' products, and to prevent them from selling said products at such prices as they may desire, and thus to deprive ultimate purchasers of said products "of the advantages in prices, and otherwise, which they would obtain from the natural and unobstructed flow of commerce in said commodities under conditions of free competition"; that said acts "constitute unfair methods of competition in comerce, within the intent and meaning of section 5 of an act of Congress entitled 'An act to create a Federal Trade Commission, to define its powers and duties and for other purposes,'" approved September 26, 1914.

In their answer the respondents set forth that, in their general business of marketing teas and coffees, they manufacture a special blend of coffee, which they have marketed for many years under the trade-mark "Seal Brand," and have expended large sums of money in advertising this brand and introducing it, not only to the trade, but more especially to consumers of coffee; that, as a result of such advertising, this brand is well and

favorably known to coffee drinkers through-out the country; that a large trade and valu-able good will have in consequence been built up in this brand; that they claim the right to sell to whom they please, on such terms as they may determine, and to refuse to deal with persons who are unwilling to comply with such terms; that they have the right to obtain information by all legitimate means as to dealers who, having accepted their goods, understanding the terms on which they have been sold to them, refuse to comply therewith; that they have the right to refuse to make further sales to those who do not conform to the terms under which respondents have sold them their products, or for any other reason; that, through their long experience and knowledge of the cost of doing retail business, they have adopted the practice of selling the Seal Brand coffee only to dealers of reputation for fair deal-ing and who strive to make a legitimate and living profit; that they have found it to be against their interest to sell to dealers who make a practice of cutting prices; that they, from their knowledge, have determined what yields a fair margin of profit below the cost of doing business; that "they have on some occasions and in some parts of the United States notified dealers who have been charged with price cutting that they would not sell them unless a minimum price, suffi-cient to secure a legitimate and living profit, was charged on resale"; that no attempt has ever been made by them to establish a uni-form sales price by retailers in any commu-nity; that when "a complaint comes to them from a dealer that a competitor is cutting prices, and selling Seal Brand coffee below a living profit, they request their district representatives to investigate the complaint, in order not to do injustice to any dealer by refusing to make further sales to him."

The answer denies specifically the allega-tions in which the acts and practices of the respondents are set forth in the complaint, as well as the allegations in regard to the effect and result of their practices.

The Federal Trade Commission has made the following findings of facts which, by the act, are made conclusive, if supported by the evidence. These are in substance:

That the respondents do not circulate any price lists specifying prices for resale, but do "from time to time, with the changes in the coffee market, furnish their customers with prices at which their products, and es-pecially the Seal Brand coffee, should be sold, and insist that these prices shall be maintained, and such prices do generally

prevail"; that, in order that their suggested retail prices shall be maintained, they "have entered into written contracts with a large number of their dealers for the maintenance of same, and have secured from their deal-ers quite generally agreements, promises, and assurances to observe the retail prices, many of which were given as the condition of a further supply of coffee by the respondents to such dealers"; that in April, 1921, the respondents entered into an active campaign to secure uniform retail prices in the state of Michigan, where their agent had made an unsuccessful effort to obtain uniformity of retail prices by means of oral arguments or promises and the co-operation on the part of the dealers by reporting names of dealers cutting prices; that, as a result of this campaign, they secured from all their custom-ers in the city of Lansing, Mich., written promises to observe 42 cents per pound as a minimum price for the sale of Seal Brand coffee; that this was brought about by send-ing to all of its Lansing customers, some 53 in number, the following letter:

"Gentlemen: You will, we are sure, read-ily concede the necessity of there being a uni-form retail selling price on any commodity that is in such general demand as our 'Seal Brand' coffee, if the interests of the dealer and consumer alike are to be protected.

"There has been a great deal of price cutting in Lansing of late, and accordingly we feel that the situation has reached a point where we ought to acquaint our cus-tomers with our views on this subject and receive in return an assurance of co-opera-tion from each one in order that 'Seal Brand' coffee may continue to afford the merchant a legitimate profit and at the same time prove a good value to the consumer.

"For this reason we feel that on the pres-ent basis of cost a fair retail price for 'Seal Brand' would be a minimum of 42 cents per pound and there are many stores who should have 45 cents. Certainly at 42 cents the margin of profit is close enough, and no fair-minded consumer would feel that they were being overcharged when asked 42 cents to 45 cents for 'Seal Brand.'

"In view of the fact that there have been many different prices quoted of late, we have taken this opportunity to express our feel-ing on the subject frankly, and are writing to receive your assurance of co-operation in maintaining this minimum price in the fu-ture, making same immediately effective if you have been quoting on a lower basis.

"We are very desirous of continuing our pleasant business relations with you, and

hope to hear from you favorably by return mail.

Yours very truly, Chase & Sanborn.

"P. S.—This letter is being mailed to all our customers in Lansing."

With this letter was inclosed a postal card for the signature of the customer, reading as follows:

"We will be glad to co-operate with you by making our *minimum price not less than* 42 cents on 'Seal Brand' coffee.

"Sign here."

All customers in Lansing signed this agreement to co-operate. To one who did not promptly respond, respondents telegraphed as follows:

"Unable to deliver your order for Seal Brand coffee without assurance of your co-operation in maintaining minimum retail price of forty-two cents. Hope you will lend us this assistance in stabilizing the local situation. Wire our expense."

The Commission has further found that the methods pursued in Lansing were pursued in the cities of Detroit, Flint, Pontiac, and Battle Creek, in the state of Michigan, and that these methods had become known as the "Lansing treatment"; that respondents requested dealers to send complaints to them, and any advertisements coming to their knowledge that other dealers were cutting prices; that if, upon investigation, the alleged price cutter was found guilty, the respondents would cease doing business with him; that the record discloses very little price cutting in the territory covered by the Boston office; that, in regard to practices here, the Commission finds:

"That reports made by dealers of price cutting on the part of other dealers were referred to the local salesman, who personally interviewed the alleged price cutter in an effort to procure his adherence to the resale price suggested by the respondents and if the price cutter persisted in cutting prices, respondents refused to supply him further."

As a conclusion of law the Commission has found "that the practices of respondents, under the conditions and circumstances herein set forth, are unfair methods of competition in interstate commerce, and constitute a violation of section 5" of the Federal Trade Commission Act.

In the order entered by the Commission, the respondents, their officers, agents, representatives, servants, and employees are ordered to cease and desist from:

"(1) Entering into contracts, agreements or understandings with dealers, or any of them, that respondents' products are to be resold by such dealers at prices specified or fixed by respondents.

"(2) Procuring either directly or indirectly from its dealers promises or assurances that the prices fixed by respondents will be observed by such dealers.

"(3) Requesting their dealers to report the names of other dealers who do not maintain respondents' resale prices, or who are suspected of not maintaining the same.

"(4) Seeking the co-operation of dealers in making effective their price maintenance policy, by manifesting to dealers an intention to act upon reports sent in by them of variations from the suggested prices, by the elimination of the price cutter or by informing dealers that price cutters reported, who would not give assurance of adherence to the suggested resale prices, had been or would be refused further sales."

The respondents contend that the findings of fact are not supported by the evidence, and that their acts, as shown by the evidence, do not constitute an unfair method of competition in interstate commerce, in violation of section 5 of said Act of September 26, 1914.

[1] It was evidently the intention of Congress that the court should not weigh conflicting evidence, but should determine whether the findings of fact are supported by any substantial evidence.

In regard to the court's duty, Chief Justice Taft said in Federal Trade Commission v. Curtis Co., 43 S. Ct. 210, 214, 260 U. S. 568, 583 (67 L. Ed. 408):

"I think it of high importance that we should scrupulously comply with the evident intention of Congress that the Federal Commission be made the fact-finding body and that the court should in its rulings preserve the board's character as such, and not interject its views of the facts where there is any conflict in the evidence."

We think the findings of facts by the Commission are sustained by the evidence and the reasonable inferences to be drawn therefrom.

The evidence in regard to the system used by the respondents in the state of Michigan, and to some extent in Kansas and Missouri, clearly shows that the respondents did enter into contracts and agreements with retail dealers that the Seal Brand coffee sold by the respondents to them should be sold at retail at a fixed minimum price, and that, in case any customer would not agree to maintain this price, the sale of this brand of coffee to him was denied.

There was no evidence that the respondents did attempt to apply what is termed the "Lansing treatment" to any of their customers in the Boston district. The evidence offered by the Commission related solely to the conduct of the Chicago branch, which had about the same number of customers as that in Boston. While there was no direct evidence that assurances were obtained from customers in this district, yet we think the fair inference to be drawn from the testimony of the manager of the business here, and a member of the firm for 33 years, is that they did have an understanding with their customers in this district that this brand of coffee should be sold by the retailer at a minimum price which they had suggested; that, if any one did not do so, he was cut off as a customer; and that their salesmen and customers co-operated with the respondents in maintaining this minimum price.

The Supreme Court said in Eastern States Lumber Association v. United States, 34 S. Ct. 951, 954, 234 U. S. 600, 612 (58 L. Ed. 1490, L. R. A. 1915A, 788):

"It is elementary, however, that conspiracies are seldom capable of proof by direct testimony, and may be inferred from the things actually done, and when in this case by concerted action the names of wholesalers who were reported as having made sales to consumers were periodically reported to the other members of the associations, the conspiracy to accomplish that which was the natural consequence of such action may be readily inferred."

In United States v. Schrader's Son, Inc., 40 S. Ct. 251, 253, 252 U. S. 85, 99 (64 L. Ed. 471), the court, discussing the situation presented by the Colgate Case, 39 S. Ct. 465, 250 U. S. 300, 63 L. Ed. 992, 7 A. L. R. 443, and that presented by the case under consideration, said:

"It seems unnecessary to dwell upon the obvious difference between the situation presented when a manufacturer merely indicates his wishes concerning prices and declines further dealings with all who fail to observe them, and one where he enters into agreements—whether express or *implied from a course of dealing or other circumstances*—with all customers throughout the different states which undertake to bind them to observe fixed resale prices. In the first, the manufacturer but exercises his independent discretion concerning his customers, and there is no contract or combination which imposes any limitation on the purchaser."

It was admitted by the manager of the Boston office that, in case a customer was found to be cutting prices, he was interviewed by a salesman of respondents, and if he was not "amenable to reasonable suggestion," but still persisted in selling below the price which respondents deemed to be a fair one, he was cut off as a customer, and that this had happened in several instances.

The only reasonable inference to be drawn from the course pursued by the respondents in the Boston district is that customers would only be retained by the respondents upon their implied agreement or assurance that they would maintain the prices fixed by the respondents for resale.

In the Beech-Nut Company Case, 42 S. Ct. 150, 257 U. S. 441, 66 L. Ed. 307, 19 A. L. R. 882, the court in its opinion discusses the inferences that may be drawn from the system practiced as follows:

"In its practical operation it necessarily constrains the trader, if he would have the products of the Beech-Nut Company, to maintain the prices 'suggested' by it. If he fails so to do, he is subject to be reported to the company, either by special agents, numerous and active in that behalf, or by dealers whose aid is enlisted in maintaining the system and the prices fixed by it. * * *

"From this course of conduct a court may infer, indeed cannot escape the conclusion, that competition among retail distributors is practically suppressed; for all who would deal in the company's products are constrained to sell at the suggested prices. * * * Nor is the inference overcome by the conclusion stated in the Commission's findings that the merchandising conduct of the company does not constitute a contract or contracts whereby resale prices are fixed, maintained, or enforced. The specific facts found show suppression of the freedom of competition by methods in which the company secures the co-operation of its distributors and customers, which are quite as effectual as agreements, express or implied, intended to accomplish the same purpose. By these methods the company, although selling its products at prices satisfactory to it, is enabled to prevent competition in their subsequent disposition, by preventing all who do not sell at resale prices fixed by it from obtaining its goods."

While the complaint of the Commission was filed after an investigation of the methods pursued by the respondents in the Chicago district and the evidence introduced, and upon which the order of the Commission was made, related to the methods practiced there, yet, if the respondents do not practice

these methods in the Boston district, they will not be harmed by a compliance with the order.

[2] Whether the acts of the respondents constituted unfair methods of competition is a question of law for the court. Federal Trade Commission v. Gratz, 40 S. Ct. 572, 253 U. S. 421, 441, 64 L. Ed. 993; Federal Trade Commission v. Curtis Publishing Co., 43 S. Ct. 210, 260 U. S. 568, 67 L. Ed. 408. [3] There is nothing in the contention of the respondents that evidence as to their practices in the Western district, particularly in the states of Michigan, Kansas, and Missouri, was not sufficient to show a system of merchandising which could be found to be an unfair method of competition.

In Federal Trade Commission v. Gratz, supra, Justice Brandeis, in his dissenting opinion, clearly points out that it is not necessary to show that the practice complained of had become the general practice. Of this he says:

"But the power of the Trade Commission to prohibit an unfair method competition found to have been used is not limited to cases where the practice had become general. What section 5 declares unlawful is not unfair competition. That had been unlawful before. What that section made unlawful were unfair *methods* of competition. ⁓ * * The purpose of Congress was to prevent any unfair method which may have been used by any concern in competition from becoming its general practice."

See, also, Fox Film Corporation v. Federal Trade Commission (C. C. A.) 296 F. 353, 356.

In their answer the respondents practically admit that the methods employed in the five Michigan cities constituted unfair methods of competition; but they say that they discontinued these practices early in 1924. The only evidence that we find in the record that this was so is that they had discontinued at that time to send out the postal cards upon which the consumer was to indicate his consent to conform to the minimum price established and to co-operate in its maintenance; but whether this was done before the date of the complaint, April 2, 1924, does not appear.

[4] Without the imposition of some legal restraint by the courts not to continue acts found to be unfair methods of competition, the Federal Trade Commission would not be justified in relying upon a mere promise not to engage in these practices. See Sears, Roebuck & Co. v. Federal Trade Commission, 258 F. 307, 169 C. C. A. 323, 6 A. L. R.

358; Guarantee Veterinary Co. et al. v. Federal Trade Commission (C. C. A.) 285 F. 853, 859; Fox Film Corporation v. Federal Trade Commission (C. C. A.) 296 F. 353, 357.

Whether the practices of the respondents constitute unfair methods of competition must be decided by us under the opinion of the Supreme Court in Federal Trade Commission v. Beech-Nut Packing Co., 42 S. Ct. 150, 257 U. S. 441, 66 L. Ed. 307, 19 A. L. R. 882.

In United States v. Colgate Co., 39 S. Ct. 465, 250 U. S. 300, 63 L. Ed. 992, 7 A. L. R. 443, which came to the Supreme Court directly from the District Court upon its sustaining a demurrer to an indictment against the Colgate Company, the Supreme Court held that, as there was no allegation in the indictment that any contract was entered into by or on the part of the defendant with any of its retail customers in restraint of interstate trade and commerce, the judgment of the District Court must be affirmed, and stated:

"In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long-recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell,"

—and distinguished that case from Dr. Miles Medical Co. v. Park & Sons, 31 S. Ct. 376, 220 U. S. 373, 55 L. Ed. 502, where there was a contract showing a combination between the seller and retail dealers in regard to the maintenance of resale prices.

In United States v. Schrader's Son, Inc., 40 S. Ct. 251, 252 U. S. 85, 64 L. Ed. 471, a case in which the manufacturer sold patented articles to other manufacturers and jobbers in several states under agreements to observe certain resale prices fixed by the seller, and in which the court below had held that the case was ruled by opinion of the court in Colgate & Co., the Supreme Court, at page 99 [40 S. Ct. 253] said:

"The court below misapprehended the meaning and effect of the opinion and judgment in that cause. We had no intention to overrule or modify the doctrine of Dr. Miles Medical Co. v. Park & Sons Co., where the effort was to destroy the dealers' independent discretion through restrictive agreements. Under the interpretation adopted by the trial court, and necessarily accepted by us, the indictment failed to charge that

Colgate & Co., made agreements, either express or implied, which undertook to obligate vendees to observe specified resale prices, and it was treated 'as alleging only recognition of the manufacturer's undoubted right to specify resale prices and refuse to deal with any one who failed to maintain the same.'

It seems unnecessary to dwell upon the obvious difference between the situation presented when a manufacturer merely indicates his wishes concerning prices and declines further dealings with all who fail to observe them, and one where he enters into agreements—whether express or implied from a course of dealing or other circumstances—with all customers throughout the different states which undertake to bind them to observe fixed resale prices. In the first, the manufacturer but exercises his independent discretion concerning his customers and there is no contract or combination which imposes any limitation on the purchaser. In the second, the parties are combined through agreements designed to take away dealers' control of their own affairs and thereby destroy competition and restrain the free and natural flow of trade amongst the states."

In the Beech-Nut Company Case the Federal Trade Commission found that the practices of the company did not constitute a contract or contracts whereby resale prices were fixed and enforced, but the court found that the specific facts in evidence showed: "suppression of the freedom of competition by methods in which the company secures the co-operation of its distributors and customers, which are quite as effectual as agreements express or implied intended to accomplish the same purpose."

Also:

"That the Beech-Nut system goes far beyond the simple refusal to sell goods to persons who will not sell at stated prices, which in the Colgate Case was held to be within the legal right of the producer."

[5] In the instant case, not only was there evidence which warranted a finding by the Commission that there was co-operation between the respondents and their customers and salesmen, but also that there were not only implied, but also express, agreements on the part of retail dealers to observe the minimum price for resale fixed by the respondents.

Viewed in the light of the decisions of the court in United States v. Schrader's Son, Inc., supra, and Federal Trade Commission v. Beech-Nut Co., supra, our conclusion is that the practices of the respondents constituted unfair methods of competition.

See, also, Oppenheim, Oberndorf & Co., Inc., v. Federal Trade Commission, 5 F.(2d) 574, C. C. A. 4th Circuit; Hills Bros. v. Federal Trade Commission, 9 F.(2d) 481, C. C. A. 9th Circuit.

[6] It was not necessary for the Commission to find specifically that its action in bringing the complaint in this case was in the public interest. By section 5 of the act discretion in bringing a complaint under it is lodged in the Commission, and in the absence of any evidence of an arbitrary exercise of this discretion, the fact that such complaint has been brought is sufficient proof that it has been brought in the public interest. See Hills Bros. v. Federal Trade Commission, supra.

The order of the Federal Trade Commission is affirmed.