### HARRIET HUBBARD AYER, Inc., v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Second Circuit. November 1, 1926.)

#### No. 4.

**1. Trade-marks and trade-names and unfair competition ⬤⇒80½, New, vol. 8A Key-No. Series.**

Finding of fact by Federal Trade Commission, supported by evidence, is conclusive.

**2. Contracts ⬤⇒116(1).**

Contracts in restraint of trade were invalid under common law.

**3. Monopolies ⬤⇒12(1).**

Oppression and monopoly are objectionable elements, to which Sherman Anti-Trust Law (Comp. St. §§ 8820–8823, 8827–8830), takes exception.

**4. Trade-marks and trade-names and unfair competition ⬤⇒68.**

Competition is condemned, when it is unfair, or characterized by fraud, unfairness, or oppression.

**5. Trade-marks and trade-names and unfair competition ⬤⇒80½, New, vol. 8A Key-No. Series.**

Federal Trade Commission is not authorized, under Federal Trade Commission Act, § 5 (Comp. St. § 8836e), to regulate trade policy or fix prices, in absence of fraud in regard to some public or private right.

6. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Under Federal Trade Commission Act (Comp. St. §§ 8836a–8836k), manufacturer may prescribe conditions under which it will deal with jobbers and retailers, so long as it does not attempt to fix price to consumer.

7. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Evidence of isolated instances, where manufacturer required retailers to maintain price, *held* insufficient to support order of Federal Trade Commission, under Federal Trade Commission Act, § 5 (Comp. St. § 8836e), requiring cessation of unlawful practices.

8. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Occasional instances of manufacturer's refusal to sell to price-cutting dealer *held* not to constitute "unlawful or unfair competition," within Federal Trade Commission Act, § 5 (Comp. St. § 8836e).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

9. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Cease and desist order, under Federal Trade Commission Act, § 5 (Comp. St. § 8836e), is unwarranted, in absence of showing of agreement tending to accomplish purpose of price fixing.

Hand, Circuit Judge, dissenting.

Petition to Review Order of the Federal Trade Commission.

Petition by Harriet Hubbard Ayer, Inc., to review an order of the Federal Trade Commission requiring petitioner to desist from carrying into effect its alleged price maintenance policy by co-operative methods. Order of Commission reversed.

Marlow & Hines, of New York City (Ernest W. Marlow, of New York City, of counsel), for petitioner.

Bayard T. Hainer, Chief Counsel, and Adrien F. Busick, Asst. Chief Counsel of Federal Trade Commission, James T. Clark, and James W. Nichol, all of Washington, D. C., for respondent.

Before HOUGH, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. The petitioner seeks a review of an order, made by respondent, requiring it to cease and desist from maintaining or carrying into effect its alleged policy of securing observance of resale prices for its products by co-operative methods, of which it is said that it, with its customers and agents, undertook to prevent others from obtaining the company's products at less than prices designated by it, or from selling to others who failed to observe such prices. In substance, there are four specifications wherein it is said the petitioner accomplishes this result: First, by procuring or entering into agreements or understandings with customers whereby the customers promise to resell the products purchased from the petitioner at prices specified by the petitioner; second, by requesting customers to report competitors who do not observe the retail prices suggested by the petitioner, or, acting on reports so obtained, by refusing or threatening to refuse sales to customers so reported; third, by requiring from customers previously cut off promises or assurances of the maintenance of petitioner's retail prices as a condition of reinstatement; fourth, utilizing in every equivalent co-operative means of accomplishing the maintenance of uniform resale prices fixed by the petitioner. The order requires the petitioner to file with the commission a report in writing setting forth in detail the manner and form in which it has complied with the order to cease and desist.

The petitioner is engaged in the business of manufacture and sale of perfumes and cosmetics and concededly is engaged in interstate commerce. It sells its products to wholesalers, jobbers, and retail dealers located in various parts of the United States. The order to cease and desist is based upon a violation of section 5 of the Act to Create a Federal Trade Commission, defining its powers and other purposes, approved September 26, 1914 (Comp. Stat. § 8836e). In defense of this charge, and in now resisting the order here sought to be reviewed, the petitioner argues: (1) That it has never been its purpose or desire either to procure or enter into agreements, written or oral, with dealers to compel them to sell its products at prices specified by them; (2) that it has never been its practice to request dealers or others to report to it their competitors who do not observe its so-called resale prices; (3) that it has never been its practice nor its purpose to establish a practice of requiring from dealers previously cut off promises or assurances of maintenance of resale prices, conditioned of continuing or re-establishing business relations; and (4) that it is not its purpose or desire to seek or obtain co-operation of others to enforce the maintenance of uniform prices.

[1] It therefore urges that the order to cease and desist is not justified in law and that the

record contains no evidence to support any of the findings necessary to support this order. It concedes that the evidence .does establish a few isolated instances on the part of the company's employés which might indicate such motive, and therefore may be criticized, but complains that no policy was initiated by the company or practice indulged in at any time which amounts to a violation of section 5 of the act. The rule is now well recognized that the finding of fact by the commission, having any evidence to support it, is conclusive and binding upon the courts, and we may not review the weight of the testimony. Federal Trade Commission v. Beechnut Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882; Oppenheim, etc., Co. v. Federal Trade Commission (C. C. A.) 5 F.(2d) 574; Hills Bros. v. Federal Trade Commission (C. C. A.) 9 F.(2d) 481; Cream of Wheat v. Federal Trade Commission (C. C. A.) 14 F.(2d) 48; American Tobacco Co. v. Federal Trade Commission (C. C. A.) 9 F.(2d) 570; Nat. Biscuit Co. v. Federal Trade Commission (C. C. A.) 299 F. 733.

[2] At common law contracts in restraint of trade were held to be invalid. The Sherman Anti-Trust Law (Act July 2, 1890, 26 Stat. 209, c. 647 [Comp. St. §§ 8820–8823, 8827–8830]) was intended to make the common law applicable in federal cases and to add to the civil redress thus afforded criminal punishment in such cases. There was nothing in the statute qualifying the phrase "restraint of trade." But by the decisions of the Supreme Court all contracts in restraint of interstate commerce, whether the restraint was reasonable or unreasonable, was forbidden. United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 S. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Ass'n, 171 U. S. 505, 19 S. Ct. 25, 43 L. Ed. 259.

And in 1915 the Sherman Anti-Trust Law was construed so as to forbid unreasonable restraint of trade, and such practices were unenforceable. Standard Oil Co. v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. Shortly thereafter the Supreme Court announced that public interest was made a determining factor as to the validity of the act complained of, and conduct or acts contrary to the spirit of the law were condemned, even though they were not within the letter of the law, and acts permissible within the letter of the law were to be condemned, if they were contrary to the spirit of the statute. United States v. American Tobacco Co., 221 U. S. 106, 31 S. Ct. 632, 55 L.

Ed. 663. This gave rise to the so-called rule of reason referred to in those cases. In 1919, in the case of United States v. Colgate & Co., 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443, the Supreme Court announced that the manufacturer might legally refuse to sell his products to a dealer who cut prices on the products of the manufacturer, and further that the manufacturer might announce in advance his minimum price for the sale of his merchandise, below which prices of sales made would be considered and treated as objectional price-cutting. It had been previously announced that a retail dealer has an unquestionable right to stop dealing with a wholesaler for reasons sufficient to himself, and might do so because he thought such dealer is acting unfairly in trying to undermine his trade. Eastern States Lumber Ass'n v. United States, 234 U. S. 600, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788. The doctrine was adhered to in the Colgate Case, supra, that the manufacturer, engaged in a private business, was entirely free to sell to whom he pleased. In Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U. S. 565, 44 S. Ct. 162, 68 L. Ed. 448, 30 A. L. R. 1114, the Supreme Court said:

"Likewise a wholesale dealer has the right to stop dealing with a manufacturer 'for reasons sufficient to himself.' And he may do so because he thinks such manufacturer is undermining his trade by selling either to a competing wholesaler or to a retailer competing with his own customers. Such other wholesaler or retailer has the reciprocal right to stop dealing with the manufacturer. This each may do, in the exercise of free competition, leaving it to the manufacturer to determine which customer, in the exercise of his own judgment, he desires to retain. * * * An act lawful when done by one may become wrongful when done by many acting in concert, taking on the form of a conspiracy which may be prohibited if the result be hurtful to the public or to the individual against whom the concerted action is. directed."

[3, 4] Oppression and monopoly are the objectionable elements to which the law takes exception. National Biscuit Co. v. Federal Trade Commission (C. C. A.) 299 F. 733. Competition is condemned when it is unfair or characterized by fraud, unfairness or oppression. This court has recognized the right to protect the manufacturer's interest and to enable the jobbers to make reasonable profits and to refuse to sell to jobbers who sell to the retailers at a greater discount than the wholesalers have approved. American Tobacco Co. v. Federal Trade Commission (C. C. A.) 9 F.

(2d) 570. In that case, we said: "Practices cannot be regarded as fair which work the demoralization of the business, and practices cannot be regarded as unfair methods of competition if a manufacturer declines to sell to wholesalers who demoralize the legitimate market by selling at a price which those in the business regard as insufficient to enable the business to be conducted with reasonable profit." And we held that the Tobacco Company was within its rights in declaring that it would not sell to jobbers who made it a practice to sell to retailers at a price which made it impossible for the jobbers to carry on the business with reasonable profit and worked for the demoralization of the trade.

[5] As long as the manufacturer does not monopolize his line of products and use unfair or fraudulent methods, he should be permitted to exercise the privilege which the law accords him of selecting his customers, and refusing to sell to customers who undermine the market by becoming price cutters. He should not be hampered in conducting his legitimate business. Section 5 of the act does not give the Federal Trade Commission power to thus regulate trade policy. It is only where the practices amount to fraud in regard to some public or private right. It is then that an unfair method in competition is established. The right to fix prices, or regulate prices, is not within the province of the respondent. Sinclair Refining Co. v. Federal Trade Commission (C. C. A.) 276 F. 686.

[6] We can see no objection to the manufacturer prescribing conditions under which it will deal with jobbers or retailers, so long as it does not attempt to fix the price or cost at which the retailers may sell to the final consumer. In the course of business there is daily recognized a practice of fixing different discounts to wholesalers and retailers, depending largely upon the volume of business or other just considerations. If free competition is to continue, the right of the individual to the exercise of reasonable discretion with respect to his own business methods must be recognized. The free flow of commerce would be interfered with, and there would be a decrease in competition, if the retailers may indulge in price-cutting that reaches the proportions of a ruinous business policy. It is then that it may be truthfully said that the public has an interest.

[7] No court has gone so far as to hold that an occasional instance in the business career of a firm, as where an agent has solicited or urged a retailer not to cut prices, amounts to an unfair business policy, or constitutes a method of merchandising which is condemned by the act. This record discloses that there has been no secrecy or subterfuge about the method pursued by the petitioner in its merchandising policy. It has stated its policy frankly to jobbers or retailers who were price cutters, and has refused to sell such customers when they were made known. It had about 8,000 customers, and there were not more than 50 complaints of customers as price cutters. It did not seek out such price cutters, but from time to time they were reported by competitors in the jobbing and retail business, and when such complaints were called to the petitioner's attention a form letter was sent, of which the following is a type:

"Word has come to us that you are selling our product at less than retail prices. Probably you are not advised of the fact that we are very insistent upon having our resale prices upheld. We aim at a high standard for all of our products, and will not knowingly permit any customer to lower them in the esteem of the buying public by cutting prices. It is our belief that you will hereafter co-operate with us in this connection, in order that we may continue on a mutually friendly basis. Very few houses throughout the country cut prices on our articles against our known wishes, and as to those houses who do cut we refuse to fill future orders. Such persistent price-cutting has a demoralizing influence in any community. It is quite true that, where the retailer receives and pays for merchandise, it belongs to him, and he can do whatever he wants with it. That is the legal aspect. However, the ethical and moral aspect, upon which business is more particularly done, is that the retailer should observe and maintain the wholesaler's prices, whenever the wish to have this done is indicated. Because of the foregoing, we trust and believe that you will hereafter maintain our retail prices.

"Very truly yours."

At the same time the complaining customer received a form letter as follows:

"Replying to your letter of ———— date, we thank you very much for bringing this matter to our attention, and have written to ———— company protesting against such action on their part. We would rather have them return the goods than sell them at cut prices, and if you find that they continue to do so in the future, please notify us promptly. Thanking you again for bringing this matter to our attention and awaiting your further commands,

"Very truly yours."

Unless the customer complained of continued to cut prices, and the petitioner received further complaints in regard to such price-cutting, his orders were filled. The price cutter found himself an undesirable customer only when he continued in his refusal. Very rarely was an investigation made by a salesman or representative of the petitioner. It had but nine salesmen in its large business. No list of price cutters was kept, no system of follow-ups was pursued after the form letter was sent out, and there was no established method of interviewing or keeping in touch with the retailer or jobber. The vice president of the petitioner, called as a witness, testified that its salesmen made no practice of following up price cutters. The instances of visits from salesmen to customers was confined to three retailers. The information as to price cutters came from the retailers only. It was the market of the retailers which was being affected by the price cutter.

[8] There is testimony that a price list of petitioner's products was sent out in some of the packages, but there is no evidence to show that there was anything by way of direction in their merchandising system to compel, or even request, retail dealers to adhere to these prices in their resales. The price list sent out in the packages served no purpose other than to apprise the ultimate consumer of the ordinary retail price at which he could purchase petitioner's products and also to name the price at which the retailer or jobber could purchase its products. In each instance where the salesman visited the retailer, the latter assured petitioner that they would not offend further by a continuing price-cutting. In two instances the customers' order was refused on the ground that they were price cutters. There were some 29 letters offered in evidence of the same purport as the samples referred to. From this it is clear that there was no established unlawful method of merchandising in petitioner's business. There was only a slight deviation from the petitioner's general merchandising practice. Out of thousands of sales made with some 8,000 customers, but a few are referred to as instances of an effort to eliminate the price cutter. In doing this, we think the petitioner did no more than it might lawfully do in selecting its customer whom it considered desirable. Such occasional instances do not constitute unlawful or unfair methods of competition referred to within section 5 of the Federal Trade Commission Act.

[9] There is nothing disclosed in this record to base a finding of fact that there was an effort of discrimination resulting in substantially lessening competition or tending to create a monopoly in this line of commerce. Price maintenance is unlawful when it tends to create a monopoly. But there was no co-operation with its jobbers and retailers, or other distributors, which was effectual either as an agreement, expressed or implied, intended to accomplish purposes of price fixing. Until such is established, an order to cease and desist is unwarranted. The case is unlike Federal Trade Commission v. Beechnut Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882. That case condemns only unfair methods of competition. It was held that the Beechnut policy there involved was wrongful. It is totally different than the isolated practices of this petitioner, for the policy constituted an unfair method of competition because of the methods employed. The price maintenance by such method was unlawful.

The order issued by the Federal Trade Commission has no support in the evidence and no warrant in the law.

Order reversed.

HAND, Circuit Judge, dissents.