**PHILIP CAREY MFG. CO. et al. v. FEDERAL TRADE COMMISSION.**

Circuit Court of Appeals, Sixth Circuit.
November 12, 1928.

No. 5023.

Knappen, Circuit Judge, dissenting.

Alfred C. Cassatt, of Cincinnati, Ohio (Richard P. Ernst and Frank W. Cottle, both of Cincinnati, Ohio, on the brief), for petitioners.

James M. Brinson, of Washington, D. C. (Robert E. Healy and Adrien F. Busick, both of Washington, D. C., on the brief), for respondent.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

MOORMAN, Circuit Judge. Petition to review an order of the Federal Trade Commission commanding petitioners to desist from: (1) Employing or using any system of espionage whereby officers, agents, and employees of petitioners obtain or seek to obtain information as to facilities, capacities, operations, or customers of any competitor; (2) circulating, representing, or publishing among prospective purchasers of preformed bituminous expansion joint any false or misleading statement concerning the ability of any competitor to fill orders or make deliveries; (3) circulating or publishing among prospective purchasers of preformed

bituminous expansion joint any false or misleading statement concerning the acceptableness or adaptability for the use intended of the product of any competitor; and (4) circulating or publishing among prospective purchasers of preformed bituminous expansion joint any false or misleading statement concerning the financial standing, business or business methods of any competitor.

The complaint on which this order was entered was issued May 23, 1924, and charged the petitioners with violating the provisions of section 5 of the Act of September 26, 1914 (Title 15, § 45, USCA), and section 3 of the Act of October 15, 1914 (title 15, § 14, USCA), by indulging in unfair methods of competition as specifically set out. Upon the hearing the Commission dismissed the charges under the Act of October 15, and failed to make any findings of fact or orders on some of the charges under the Act of September 26, but did make findings of fact on which it based its order referred to.

It is urged upon us in this review that the order of the Commission must be set aside, because the findings upon which it is based are not supported by substantial evidence.[1] Section 1 of the order deals with espionage, and is based upon the finding that petitioners had sent spies under assumed names to plants of competitors to report on facilities, capacities, and extent of operations, and had used the information so obtained as a basis for representing to prospective customers that such competitors could not make extensive deliveries or fill orders of magnitude, "though such reports showed that such competitors were taking care of all business coming to them, and planning to expand, so as to take care of more business, if and when it was obtained."

The evidence touching this subject shows that in April of 1922 an employee of the petitioners, representing himself as a possible customer, called upon the manager of a plant which was manufacturing expansion joints for the Servicised Products Company and obtained and furnished to petitioners certain information concerning the methods and capacity of the plant; that later, in June, another employee of the petitioners called again at the same plant, obtained practically the same information, and furnished

it to the sales manager of the petitioners. These reports were shown by petitioners to an examiner of the Federal Trade Commission the latter part of 1922. The other instance of alleged espionage occurred in the fall of 1923, when an employee of the petitioners, representing himself as a possible customer, called at a plant of the Servicised Corporation in Illinois and obtained similar information, which he transmitted to the office of petitioners in Chicago.

The old method of making expansion joints was to pour heated bituminous material into the space between the parts to be joined. The petitioners, acting under patents which they held, were the first to manufacture and sell a preformed joint, and for several years they had a practical monopoly on such joints. As competitors came into the field, controversies arose as to whether they were infringing upon the petitioners' patents; and petitioners claim that the visits were made to the plants of the Servicised Company to ascertain whether the product which that company was making was an infringement upon their patents. The information which they sought and obtained did not relate to any secret process or formula, but was such as the Servicised Company was willing to furnish to any possible customer. It has never been held that the obtaining of this kind of information in the manner in which petitioners obtained it, plus a use of it without misrepresentation, amounts to unfair practice under the statute. We do not find it necessary to consider that question, because, before the Commission was warranted in entering the espionage order, it was necessary that it find upon substantial evidence that the information was unlawfully used to hinder or stifle competition. Federal Trade Commission v. Beech Nut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882. There was a finding by the Commission that it was so used; but we find no substantial evidence in the record to support that finding.

Paragraph 2 of the order commanding petitioners to desist from circulating or using among prospective purchasers of expansion joints any false or misleading statement concerning the ability of any competitor to fill orders or make deliveries rests upon the finding by the Commission that the information obtained from the visits referred to was used as a basis for such representation. As we have said, there is no evidence to support that finding. Indeed, the sole contention of respondent on this point is that illegal use is to be inferred from the wrongful procure-

---

[1] Federal Trade Commission v. Winstead Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729; Moir, etc., v. Federal Trade Commission (C. C. A.) 12 F.(2d) 22; Harriet Hubbard Ayer v. Federal Trade Commission (C. C. A.) 15 F.(2d) 274; Arkansas Wholesale Grocers' Ass'n v. Federal Trade Commission (C. C. A.) 18 F.(2d) 866.

ment. This in our opinion cannot be done as against the showing made by the petitioners that the information was obtained for a lawful purpose and was not otherwise used.

■ Section 3 of the order deals with the circulation among prospective purchasers of expansion joints of false or misleading statements concerning the financial standing and the business or business methods of competitors. The finding of fact upon which this part of the order is based is that petitioners had represented to prospective purchasers that the product of their competitors was unsuitable for the purpose intended and would not be passed or accepted. There are some eight or ten instances disclosed in the evidence in which petitioners' salesmen made such representations. L. H. Tower, who had been assistant sales manager for the Carey Company, but at the time of the hearing was a salesman for the Servicised Company, testified that he and Schueler, manager of the Chicago office of petitioners, instructed salesmen to say to prospective purchasers that in cold weather the Servicised joint would crack and break, and in hot weather it would "stick together on the job." This testimony would be important in some circumstances; but it is not important here, where it does not appear that any salesman ever did this, and where there is a showing of only a small number of other disparaging comments—eight or ten in the course of several years, among many salesmen throughout the country. When so considered, it does not, we think, lend authority or purpose to the incidents relied upon.

One witness testified that he was about to purchase the Servicised joint when a representative of the Carey Company told him that he would not be able to use it; "that it would not be passed by the engineers." Witness purchased it and it was rejected by the engineers; but later its use was permitted on condition that he use a double thickness. We see no evidence of an unfair method of competition in this. Nor do the other incidents relied upon, when considered in connection with all the proofs, amount to such method. They cover a period of four years, during which the petitioners had salesmen and distributors in many cities of the country. In 1926 they had more than 600 salesmen selling their products, including this expansion joint. They had branch offices and distributors in almost all of the larger cities. They had many competitors, some of them, including the Servicised Company, doing business all over the United States, and it would be strange indeed if, under those circumstances, some of their salesmen, and also other salesmen, had not made disparaging remarks about competitors.

It is undoubtedly true, that a single act may constitute substantial evidence of an unfair method of competition. Fox Film Corporation v. Federal Trade Commission (C. C. A.) 296 F. 353. But when all the facts are considered in this case, there is no act or combination of acts which in our opinion can be given that effect. Saving the testimony of Tower referred to, which was denied by Schueler, the evidence shows that petitioners, not only did not authorize their salesmen to disparage the products of their competitors, but expressly instructed them not to do so. Their policy, as disclosed in the evidence, was to sell their product on its merits, and not on the demerits of other like products. Proof that a salesman here and there out of many—as many as 600 at one time—spoke disparagingly of the product of a competitor (not more than a dozen times in all) does not amount to substantial evidence of an unfair method of competition.

■ The final paragraph of the order is based on a finding that agents and employees of the petitioners circulated among their salesmen a statement that a bankruptcy petition had been filed against the Servicised Products Company and caused their salesmen to use the information in connection with the sale of their goods in competition with that company. The finding recites that a petition in bankruptcy was filed against the Servicised Company and Alfred C. Fisher by three competitors, one of which was a licensee of petitioners, and another a creditor of a company which had made joints for the Servicised Company, but was then a competitor of that company. It also recites that the bankruptcy proceedings were never pressed, and that at the time the Servicised Company was not strong financially, but was solvent and meeting its obligations.

The evidence on this point shows that petitioners regularly received reports from R. G. Dun & Co. in respect to customers, contractors, and competitors; that, as these reports came in, copies were made and sent out to petitioners' salesmen; that one of the reports showed that a bankruptcy petition had been filed against the Servicised Products Company by the three creditors mentioned; and that a copy of this report was sent out to the salesmen in the regular routine. It does not appear that petitioners had anything to do with the filing of this bankruptcy petition, or that they knew it had been filed until the report came in in the regular course

from the rating company. Nor was there any evidence to show that any of their salesmen ever used this information after it was furnished to them. Perhaps they did. It was true, and we know of no standard of practice which forbids the telling of the truth, even about a competitor.

It is said, however, in argument, that petitioners made exclusive contracts with distributors; that in some cases they used the Moeller patent to intimidate competitors or drive them out of business, and in others to formulate satisfactory arrangements with companies operating under other patents; that they sought to have engineers provide in their specifications for highway construction that the "Carey joint or its equal" should be used; and that they now occupy a dominant place in the expansion joint industry. Upon none of these charges was there a finding by the Commission. Some of them were not covered by the complaint; as to those that were, the Commission either dismissed the complaint or made no finding of fact. We are not called upon to decide these disputed questions, and we find nothing in the evidence concerning them to support any inference that would add weight to the findings which the Commission did make. Petitioners, it is true, are the largest manufacturers and sellers of preformed expansion joints. For several years they had a monopoly in that business—a lawful monopoly, by virtue of patents which they owned. They had the right to protect their patents, and there is no evidence to show that under the guise of doing so they were guilty of unfair practice. But, aside from these considerations, the Commission made no finding on any of these disputed points, and we see nothing in the evidence concerning them which adds any force to the findings which the Commission did make. Those findings, as we have said, have no support in the evidence.

The order is reversed.

KNAPPEN, Circuit Judge (dissenting). I am not convinced that the action of the Commission should be set aside. Not only does the conduct of the petitioners impress me as highly unethical, to say the least, but I am disposed to think that generally, at least, the findings of the Commission are supported by substantial testimony, and so are binding upon us (38 U. S. St., c. 311, p. 720, § 5; 15 USCA § 45), unless the facts found fail to constitute, in law, unfair competition, which I am not prepared to say is the case here. I think the Commission was not bound to conclude that the only purpose of sending persons, not customers, to the place of business of its competitor, was to ascertain whether petitioners' patents were being infringed. Nor do I think it a sufficient answer to the charge of espionage that the competitors would have given to a good-faith intended and inquiring customer the same information given to the secret representatives of petitioners. Method, motive, and purpose may well make unfair a competition which otherwise might not be so, and there seems to me substantial evidence of a purpose to drive the competitor out of business. Moreover, I am not convinced that competition may fail to be unfair merely because it was not exercised all the time. The useful purpose of the statute here invoked is preventive, not punitive, and I am not convinced that the unfair competition was so trivial as to be negligible.

There may, perhaps, be room for a modification in some respects of the findings or the scope of orders to cease and desist, although I am not so convinced. But I am impressed that the situation called for a reasonable measure of relief, and that the Commission's order should not be set aside.