## FOX FILM CORPORATION v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Second Circuit. January 7, 1924.)

### No. 121.

1. **Commerce ☞40(1)—Manufacturer of moving picture films held engaged in "interstate commerce," within the Federal Trade Commission Act.**

   Manufacturer of moving picture films, which shipped the films to its agencies in several states to be sold and leased to owners and operators of moving picture theaters throughout the United States, was engaged in "interstate commerce," within Act Sept. 26, 1914 (Comp. St. §§ 8836a–8836k), empowering the Federal Trade Commission to prevent persons and corporations engaged in interstate commerce from using unfair methods of competition.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Findings that moving picture film producer used unfair methods in connection with three pictures held to support order to desist.**

   Federal Trade Commission's findings that motion picture film producer reissued three old pictures under new titles as new photo plays, and advertised such pictures as new pictures not previously exhibited, and induced the public to believe them to be new pictures, *held* to support ·order to desist from reissuing old pictures under new titles as new pictures, as unfair competition.

3. **Trade-marks and trade-names and unfair competition ☞68—One may be engaged in "unfair competition," within Federal Trade Act, though general practice is not unfair.**

   Under Act Sept. 26, 1914 (Comp. St. §§ 8836a–8836k), empowering the Federal Trade Commission to prevent persons and corporations engaged in interstate commerce from using unfair methods of competition, the general practice of the offender need not be unfair, since general practice may involve many methods, each conceived and to be applied for its particular desired result, but one act that constitutes an unfair practice may of itself be offensive to the act.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

4. **Trade-marks and trade-names and unfair competition ☞68—Motion picture producer's reissuance of old films under new titles as new pictures held "unfair competition."**

   Issuance by producer of moving picture films, engaged in competition with other corporations, persons, and partnerships similarly engaged, · of old pictures under new titles as new picture never before exhibited, *held* "unfair competition," within Federal Trade Act (Comp. St. §§ 8836a–8836k).

5. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Corporation's abandonment of unfair methods does not deprive Commission of authority to command corporation to desist.**

   The mere fact that a corporation which has engaged in unfair methods of competition has discontinued such methods and promises to follow a different practice does not deprive the Federal Trade Commission of authority under the Federal Trade Act (Comp. St. §§ 8836a–8836k) to command the corporation to desist from using such methods.

6. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Effect of order directing moving picture film manufacturer to desist from reissuing old pictures under new titles stated.**

   An order of the Federal Trade Commission commanding a manufacturer of moving picture films to desist from reissuing old films under new titles, as new pictures, and from advertising such pictures as pictures

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

which have never before been exhibited, does not prohibit the remaking of a photo play in which an entirely new cast is used, or an entirely new production is made or where the original title is used, or reference made thereto in the advertising of the picture.

Petition to Review Order of the Federal Trade Commission.

Petition by the Fox Film Corporation to review an order of the Federal Trade Commission directing the petitioner to cease and desist from methods of unfair competition in trade.  Order affirmed.

Saul E. Rogers, of New York City (Percy Heiliger, of New York City, of counsel), for petitioner.

Adrien F. Busick, of Washington, D. C., for respondent.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge.  [1] Under the authority of the act of September 26, 1914 (38 Stat. 717 [Comp. Stat. § 8836a]), the respondent filed a complaint against the petitioner, alleging that it was engaged in the production of photoplays, and leased and sold its products to the owners and operators of moving picture theaters throughout the United States, granting the right to exhibit said photoplays to the public.  It is admitted that the petitioner, in leasing and selling to the exhibitors, maintains agencies at various cities in the several states of the United States.  It makes positive photoplays produced by it and packs the same in such manner as to be adapted for use in motion picture projecting machines.  These are called films, and the photoplays are known in the trade as releases.  It ships to its agencies in several states from New York City.  The petitioner is therefore engaged in interstate commerce.  Binderup v. Pathé Exchange (Supreme Court, Nov. 19, 1923) 44 Sup. Ct. 96, 68 L. Ed. 114.

The parties stipulated the facts and they had been embodied in the findings of the Commission.  It is stipulated that, when a picture has been run and generally exploited in the United States or in a considerable portion of it, and it is again offered for exhibition at a later period, it is commonly known as a reissue or revival; that according to the accepted practice, usage, and custom of this industry, unless the original title of the picture is retained, or the picture is so described in the contract between the producer and the exhibitor and in the advertising matter as a reissue or revival of a photoplay previously released, it is understood by the exhibitor and the public that the photoplay to be furnished or screened is or will be a new picture; that is to say, a continuity not previously exhibited or exploited throughout any considerable portion of the United States.  On December 18, 1916, the petitioner released a motion picture which was entitled "The Love Thief," and on May 28, 1917, it released a motion picture which was entitled "The Silent Lie," and on September 17, 1917, it released a motion picture entitled "The Yankee Way."  These pictures were extensively exploited and exhibited throughout the United States.  They were known at the time as feature pictures, being ordinary five-reel pictures designed for the principal part of an ordinary motion picture theater program.  It is stipulated that in the course of the season of 1919–1920 the petitioner reissued the old pic-

ture of "The Love Thief" as "The She Tiger," reissued the old picture of "The Silent Lie" and entitled it "Camille of the Yukon," and reissued the old picture of "The Yankee Way" and entitled it "Sink or Swim." It furnished each of these three pictures so retitled to exhibitors in various states of the United States in connection with leases providing for the petitioner's so-called program series of pictures. All other pictures furnished under such program contracts to exhibitors were new pictures.

The petitioner furnished exhibitors with bill posters and other matter for use in advertising the photoplays to the public. In no way did the petitioner disclose that the pictures so furnished, or any of them, were reissues. The advertising matters furnished exhibitors by petitioner in connection with the picture "Sink or Swim" conspicuously displayed the legend "William Fox presents George Walsh in 'Sink or Swim,'" and in connection with "The She Tiger" it conspicuously displayed the legend "The She Tiger from the famous novel 'The Love Thief' by N. P. Niessen." The advertising furnished exhibitors in connection with the picture "Camille of the Yukon" displayed the legend "Based on Larry Evans' Alaskan novel 'The Silent Lie.'" Various exhibitors, who received these three photoplays from the petitioner, used this advertising matter to advertise the exhibition of the pictures without further disclosing to the public that they were old pictures. It was, in effect, stipulated that, without further information from the petitioner or its agents that any or either of the pictures were reissues, the exhibitors believed them new pictures and advertised them for exhibition with the bills and posters supplied by the petitioner, and in some instances they received complaints from patrons of their theaters who claimed to have been misled into believing them new pictures. In effect, it was stipulated that, in communities where pictures were received and advertised, patrons attended the exhibition under the belief that they were new pictures.

[2-4] The petitioner concedes that it is engaged in competition with other persons, partnerships, and corporations similarly engaged. Through its agency, it enters into leases, and contracts with exhibitors, agreeing to furnish the exhibitors over a fixed period its current releases, and grants the right to exhibitors to exhibit the same to the public for a stated number of performances. The president of the petitioner, in effect, testified that it has never been the general practice or policy of the petitioner to exploit, sell, or lease old pictures under new names, or to reissue pictures under any names other than those of their original release; that the practice or policy of reissuing of old pictures under new names is obnoxious to him and to the motion picture industry, "and indefensible from any ethical or business standpoint; that of the multitude of motion pictures or photoplays produced by respondent he knows of no instance, except those involved in this proceeding, in which respondent has reissued any old pictures under new names; that with respect to the above pictures there was no attempt to mislead the exhibitors or the public that said pictures were not reissues." The order to cease and desist provides:

"That the respondent Fox Film Corporation, its agents, servants, and employees, cease and desist from directly or indirectly advertising, selling or

leasing, or offering to sell or lease, reissued motion picture photoplays under titles other than those under which such photoplays were originally issued and exhibited, unless the former titles of such photoplays and the fact that they theretofore have been exhibited under such former titles be clearly, definitely, distinctly, and unmistakably stated and set forth, both in the photoplay itself and in any and all advertising matter used in connection therewith, in letters and type equal in size and prominence to those used in displaying the new titles."

While the findings of the Commission embraced but three pictures where the unfair methods were practiced, that is sufficient to support the order to desist. It is now well recognized that the act refers specifically to unfair methods of competition. This does not mean the general practice of the offender must be unfair in competition. General practice may involve many methods, each conceived and to be applied for its particular desired result. One act that constitutes an unfair practice may of itself be offensive to the act. Congress had in mind, in this legislation, the prevention of acts which amount to unfair methods of competition, whatever their inception.[1] Federal Trade Comm. v. Gratz, 253 U. S. 421, 40 Sup. Ct. 572; 64 L. Ed. 993. To meet this, the Anti-Trust Law was supplemented. To violate the Sherman Act (Comp. St. § 8820 et seq.), it is necessary to find that the practice has grown to such proportions and strength that the business and practice is obnoxious as a trust or monopoly and restrains trade.

No better illustration may be exampled than the instant case of these three offenses or acts, which are unfair restraints of trade and damage the competitor who sells to the exhibitors. The Federal Trade Act (Comp. St. §§ 8836a–8836k) was intended to reach such unfair business methods when the Anti-Trust Law could not do so. The Commission may restrain an act which tends so unduly to hinder competition as to permit the act to be classed as an unfair method of

---

[1] Senator Cummins, chairman of the committee which reported the bill, said (Cong. Rec. vol. 51, p. 11455): "Unfair competition must usually proceed to great lengths and be destructive of competition before it can be seized and denounced by the Anti-Trust Law. In other cases it must be associated with, coupled with, other vicious and unlawful practices in order to bring the person or the corporation guilty of the practice within the scope of the Anti-Trust Law. The purpose of this bill in this section and in other sections which I hope will be added to it, is to seize the offender before his ravages have gone to the length necessary in order to bring him within the law that we already have. We knew little of these things in 1890. The commerce of the United States has largely developed in the last 25 years. The modern methods of carrying on business have been discovered and put into operation in the last quarter of a century, and as we have gone on under the Anti-Trust Law and under the decisions of the court in their effort to enforce that law, we have observed certain forms of industrial activity which ought to be prohibited, whether in and of themselves they restrain trade or commerce or not. We have discovered that their tendency is evil; we have discovered that the end which is inevitably reached through these methods is an end which is destructive of fair commerce between the states. It is these considerations which, in my judgment, have made it wise, if not necessary to supplement the Anti-Trust Law by additional legislation, not in antagonism to the Anti-Trust Law, but in harmony with the Anti-Trust Law, to more effectively put into the industrial life of America the principle of the Anti-Trust Law, which is fair, reasonable competition, independence to the individual, and disassociation among the corporations. * * *"

competing. An act which involves such fraud in competition as to render it unfair is an act within the condemnation of this statute. It is by stopping its use before it becomes a general practice that the effect of an unfair method in suppressing competition is destroyed and competitors protected.

False and misleading advertising or representations concerning hosiery was held to be an unfair method of competition. Winstead Hosiery Case, 258 U. S. 483, 42 Sup. Ct. 384, 66 L. Ed. 729. In that case a manufacturer's practice of selling underwear and other knit goods made partly of wool was to label it "Natural Merino," "Natural Worsted," and "Natural Wool." This product was purchased by the consuming public in the retail trade as indicating pure wool fabrics. It misled part of the public into buying, as all-wool garments, garments made largely of cotton, and aided and encouraged misrepresentation by unscrupulous retailers and other salesmen. It was held to be an unfair method of competition as against manufacturers of like garments made of wool and wool and cotton, who branded their products truthfully, and therefore should be suppressed under section 5 of the Federal Trade Act. It was held, further, that such method of competition does not cease to be so because competitors became aware of it, or because it becomes so well known to the trade that retailers, as distinguished from consumers, are not deceived by it.

The pictures in the instant case were presented in the advertising matter and misrepresented by the petitioner to the exhibitors as new pictures, when they were in fact old. The exhibitors in the trade had a right to expect that a new name described a new picture. The exhibitors were accordingly deceived. It had been the custom to entitle the photoplay products truthfully. Fox's stipulated testimony concedes this. In Royal Baking Power Co. v. Federal Trade Comm. (C. C. A.) 281 Fed. 744, the petitioner, due to the increased cost of cream of tartar, discontinued manufacturing its widely advertised brand of cream of tartar baking powder, which had been on the market for 60 years, and began to manufacture a phosphate baking powder, and advertised it for sale at about one-half the former price, under practically the same trade-name and put up in the same containers. This court held that the finding to the effect that this was misleading to the public and unfair to other manufacturers selling cream of tartar baking powder was justified, and that false and misleading labeling and advertising inducing the public to believe that the phosphate baking powder it was manufacturing was the same as the more expensive cream of tartar baking powder which it had formerly manufactured was an unfair method of competition and could be prevented by the Trade Commission.

[5, 6] The fact that the petitioner has discontinued this misrepresentation, and promises a business practice which will forbid the publishing of false advertising in the future, does not deprive the Commission of authority to command the company to desist from such advertising, for it is not obliged to assume that false representations or publications or advertising will not be resumed. Guarantee Vet. Co. v. Federal Trade Comm. (C. C. A.) 285 Fed. 860. This record establishes that exhibitors were actually misled by the contracts and

the advertising matter into the belief that the pictures purchased for exhibition were new pictures. The case, therefore, presents the instance of a producer and distributor misrepresenting the quality of his goods in his contracts, and in his advertising matter misrepresenting them so that the trade, apart from the public, was misled and deceived. In the reissuance of the old pictures under the new titles, without any intimation or notice concerning their origin or history, the petitioner was passing off one of its products for another of its products; that is to say, one of its old productions for a new production. This order to desist will not prohibit the remaking of a photoplay in which an entirely new cast is used, or an entirely new production is made, or where the original title is used or reference made thereto in the advertising of the picture. There is no objection to the use of the former photoplay, if the name be not changed and no deception be practiced in its release to the exhibitors or its exhibition, The order of the Commission is affirmed.