ARMAND CO., Inc., et al. v. FEDERAL TRADE COMMISSION.

No. 195.

Circuit Court of Appeals, Second Circuit.

July 1, 1935.

Charles Wesley Dunn, of New York City, for petitioners.

W. T. Kelley, Chief Counsel, Federal Trade Commission, Martin A. Morrison, Asst. Chief Counsel, and James W. Nichol, all of Washington, D. C., for respondent.

Before MANTON, SWAN, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This petition seeks a review of an order of the Federal Trade Commission directing petitioners to cease and desist from (1) entering into or procuring, either directly or indirectly, from wholesale or retail dealers, contracts, agreements, understandings, promises, or assurances that respondent's products, or any of them, are to be resold by such wholesale or retail dealers at prices specified or fixed by petitioner; (2) entering into or procuring either directly or indirectly from wholesale dealers contracts, understandings, promises, or assurances that petitioner's products are not to be resold by such wholesalers to price-cutting retail dealers.

The complaint was filed against the petitioner, an Iowa corporation, and others, June 27, 1925, charging the maintenance of resale prices for its products fixed at arbitrary levels through the medium of expressed or implied agreements. Section 5, Trade Commission Act, 38 Stat. 719 (15 USCA § 45). After extensive hearings and consideration, the order appealed from was entered, January 27, 1933, reciting a finding that the petitioner was engaged in interstate commerce and that its practices were to the prejudice and injury of wholesale and retail dealers and the public and are unfair methods of competition in commerce.

If the evidence supports the finding of the Commission as to the facts, they must be accepted by us. Fed. Trade Comm. v. Algoma Lumber Co., 291 U. S. 67, 73, 54 S. Ct. 315, 78 L. Ed. 655; Fed. Trade Comm. v. Balme, 23 F.(2d) 615 (C. C. A. 2); Harriet Hubbard Ayre, Inc., v. Fed. Trade Comm. (C. C. A.) 15 F.(2d) 274. We are not merely to weigh the evidence

to see if we would reach the same conclusion as did the Commission. Fed. Trade Comm. v. Pacific States Paper Trade Asso., 273 U. S. 52, 47 S. Ct. 255, 71 L. Ed. 534; Eastern States Retail Lumber Dealers' Asso. v. United States, 234 U. S. 600, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A. 788.

Petitioner's business is manufacturing and selling toilet articles and cosmetics. It sells its products to wholesale and retail dealers throughout the United States, and by the use of various means of advertising has built up a large and substantial demand for its products by the public.

In November, 1919, petitioner adopted a plan or policy of suggesting to dealers who purchased its products the resale prices therefor, and at that time made its first public announcement of its policy in writing, and caused such to be published and circulated among the wholesale and retail druggists of the United States. Since that time its policy has been expressed orally as well as in writing through its representatives, who communicated the conditions of its policy in regard to resale of its product by word of mouth. Petitioner's policy, reduced to writing and circulated, has been unchanged since 1919, and states that the petitioner, in the interest of fairness and justice to all concerned, suggests fair resale prices for its products, and declines to sell to dealers who effect any other unfair trade practices in the merchandising of its products. As an evidence of the petitioner's appreciation of a purchaser's "continued and active interest" in the merchandising of petitioner's products, its policy was found declared to be to include certain free goods as a "generous dividend." Another feature of petitioner's merchandising policy was to have the resale of its products confined to the wholesale and retail drug trade, at least as far as such confinement was possible. At all times the petitioner has made it at least an unwritten part of its merchandising policy to suggest to wholesale dealers that they do not sell petitioner's products to department stores.

Beginning with the year 1920, petitioner requested all dealers who wished to buy its products—the request being made either directly or through petitioner's salesmen—to make a written and signed "declaration of intention" as to the manner in which it was proposed to resell petitioner's products, and all dealers received a model form of declaration of intention, which was re-

quired to be signed by the dealers and returned to the petitioner. This form stated that it was the purpose of the dealer who signed it to observe the fair resale prices suggested by the petitioner for its products, and that the declaration of intention was made freely and voluntarily and was not to be understood as either an express or implied obligation or agreement on the part of the dealer. It was further declared that the intention to observe petitioner's suggested resale prices was in recognition of petitioner's right to refuse to sell to dealers who did not charge petitioner's suggested retail prices. The declaration of intention was further stated to be that the dealer would sell petitioner's products only within the dealer's own store and that the dealer would not sell the products to any other dealer. By a circular letter in 1920, petitioner's salesmen were instructed that they might lawfully inquire, prior to sale, whether a dealer intended to resell at the prices suggested by the petitioner, and that they might suggest to a dealer that he write a declaration of intention to that effect according to the form sent. The salesmen were likewise directed not to make "any agreement with the dealers as to the resale prices."

Since the first publication in 1919 of its merchandising policy, the petitioner has from time to time republished it to the wholesale and retail dealers, informing them that the petitioner declined to sell its products to dealers who did not charge petitioner's suggested retail prices. It has also been the practice of the petitioner to inform dealers that, upon receipt of a satisfactory declaration of their intention as to the prices at which they would sell petitioner's products, petitioner would give "prompt and interested attention to their orders."

In 1922 the petitioner discontinued its practice of obtaining signed declarations of intention from its dealers, and in April, 1923, dealers were informed that declarations of intention signed by them would be considered null and void. But mere discontinuance of unfair competitive methods, however, is no defense. Fed. Trade Comm. v. Wallace (C. C. A.) 75 F.(2d) 733, 738; Butterick Co. v. Fed. Trade Comm. (C. C. A.) 4 F.(2d) 910; Fox Film Corp. v. Fed. Trade Comm. (C. C. A.) 296 F. 353; Guarantee Veterinary Co. v. Fed. Trade Comm. (C. C. A.) 285 F. 853. And the discontinuance of this practice did not

bring about a discontinuance of its policy as to resale prices. The record is replete with evidence that, although declarations of intention were no longer obtained or required, agreements or understandings were entered into between the petitioner and certain dealers whereby dealers, in consideration of the sale by petitioner of its products to said dealers, agreed to refuse to resell petitioner's products to retail stores which did not, upon resale, charge the retail prices suggested by the petitioner. Secret instructions were given to salesmen to follow this plan as late as September, 1923. And as late as September, 1927, petitioner's president reiterated the same method. In 1923, the petitioner entered into an agreement with a drug company of Seattle, Wash., whereby the drug company agreed not to sell petitioner's product to retail dealers who resold the products at a price less than that suggested by the petitioner. In pursuance of this agreement, and in co-operation with the petitioner, the drug company has kept a list of those retail dealers in its sales territory who are known to be price cutters, and it has consistently refused, since entering into that agreement, to sell petitioner's products to such dealers because they were price cutters. In 1924 a similar agreement was entered into with a firm in Louisville, Ky., whereby the latter agreed to resell the petitioner's products at the prices suggested by the petition in consideration of the fact that petitioner would thereafter sell its goods to the drug company. Other agreements were made by the petitioner with other firms throughout the country for the years after 1922, the details of which it is unnecessary to state here.

Agreements with these firms and others indicated clearly a desire to have a tacit or oral agreement for the fixing of prices on resale or price maintenance. At petitioner's suggestion it caused those wholesale dealers, to whom it sold its products, to police their territory through their salesmen so as to discover what retail dealers were selling petitioner's products below the prices fixed by the petitioner, and thereby prevent any such retailers from obtaining goods from the petitioner. "Salesmen" were taught and trained in the petitioner's merchandising policy, and their specific duty was to instruct dealers, both wholesale and retail, in that policy. Through salesmen and by circularized literature, the entire drug trade has been plainly informed by the petitioner that any dealer who failed to sell at petitioner's suggested retail prices would be unable to obtain petitioner's products in the future. Wholesale dealers were informed that they would be unable to purchase petitioner's products if they resold them to any retail dealer who failed to resell at petitioner's suggested prices. In many instances such price cutters were refused sales and were dropped from petitioner's list of customers, but later reinstated upon satisfying the petitioner of their willingness to comply with petitioner's policy, and that thereafter they would maintain prices.

It was found as a fact by the Commission that the chief objective of petitioner's merchandising policy was the maintenance of the wholesale and retail prices suggested by the petitioner for its products, and that the direct effect of petitioner's practices had been, and now is, to suppress competition among wholesalers and between retail dealers engaged in the distribution and sale of petitioner's products. The further effect was the constraint imposed upon wholesale and retail dealers in selling petitioner's products at prices fixed by the petitioner, and the preventing of sale by such dealers of petitioner's products at prices which such dealers desired, thereby depriving the ultimate purchasers of petitioner's products of that advantage of price which otherwise would be theirs in a natural and unobstructed flow of commerce under free competition.

The Commission concluded that the petitioner's practices were to the prejudice and injury of the public and constituted unfair methods of competition in commerce and a violation of section 5 of the Trade Commission Act. The findings of the Commission are amply supported by the evidence. The evidence supports the finding that by agreements between petitioner and its dealers it maintained prices and prevented those who would not do so from securing petitioner's products.

Where a manufacturer tries to maintain the resale prices of his goods, by restrictions marked on the goods or otherwise communicated to the retailer, a violation of these restrictions does not create a cause of action in favor of the manufacturer either at common law or under the copyright or patent laws, and, where resale prices are sought to be maintained by a system or policy of contracts, combinations, or co-operative efforts, such system or policy is illegal and in violation of the

anti-trust laws. Fed. Trade Comm. v. Beech Nut·Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882; Fed. Trade Comm. v. Gratz, 253 U. S. 421, 427, 40 S. Ct. 572, 64 L. Ed. 993; United States v. Colgate & Co., 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443; Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502. Public interest may exist, although the practice deemed unfair does not violate any private right. Fed. Trade Comm. v. Klesner, 280 U. S. 19, 50 S. Ct. 1, 74 L. Ed. 138, 68 A. L. R. 838; Fed. Trade Comm. v. Beech Nut Packing Co., supra; Fed. Trade Comm. v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729.

This petitioner dealt with 39,000 retail druggists out of a total of 56,000, and 247 wholesale druggists out of a total of 550. The wholesalers and retailers were in competition with each other in the sale of petitioner's products. This is a kind of competition between wholesalers and retailers of a product of a single manufacturer which was intended by the decisions of the courts to be free and open. The policy in question had a tendency to stifle competition, and was unlawful.

Order affirmed.