EUGENE DIETZGEN CO. v. FEDERAL TRADE COMMISSION.

KEUFFEL & ESSER CO. et al. v. SAME.

CHARLES BRUNING CO., Inc., et al. v. SAME.

C. F. PEASE CO. et al. v. SAME.

Nos. 7791, 7820, 7821, 7828.

Circuit Court of Appeals, Seventh Circuit.
Feb. 29, 1944.

As Modified on Denial of Rehearing
May 3, 1944.

Arthur M. Cox, of Chicago, Ill., and Wm. E. Lamb, of Washington, D. C. (Pam, Hurd & Reichmann, of Chicago, Ill., of counsel), for petitioner Eugene Dietzgen Co.

W. Randolph Montgomery, of New York City, for petitioners Keuffel & Esser Co., et al.

Howard P. Beckett and Richard W. Thorington, both of Philadelphia, Pa., for petitioners Charles Bruning Co., Inc., et al.

Herbert Pope, of Chicago, Ill., and Karl D. Loos and P. C. King, Jr., both of Washington, D.C., for petitioners C. F. Pease Co. et al.

Wm. T. Kelley, Chief Counsel, Joseph J. Smith, Jr., Asst. Chief Counsel, and Cyrus B. Austin and J. B. Truly, Sp. Attys., Martin A. Morrison, Edward W. Thomerson, and James W. Nichol, all of Washington, D. C., Federal Trade Commission, all of Washington, D. C., for respondent.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Petitioners, Eugene Dietzgen Co., Keuffel & Esser Co. and Karl Keller, Charles Bruning Co., and C. F. Pease Co., and others, seek a review of an order of the Federal Trade Commission directing them and others to cease and desist from an alleged conspiracy to fix and maintain prices. Petitioners manufacture and sell scientific drafting and related instruments and materials.

The chief controversies are over: (1) The sufficiency of the evidence to support the findings of the Commission that there existed a conspiracy to fix prices; (2) The insufficiency of the evidence to support the order as entered, in view of the contention that most of the evidence had to do solely with blue print paper, whereas the order extends to many other products; (3) The jurisdiction of the Federal Trade Commission to enter a cease and desist order where the alleged illegal practice is a violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, and cognizable thereunder. Such action is allegedly not cognizable under the F. T. C. Act as an "unfair practice"; (4) The failure of evidence to show any injury to any competitor, allegedly a prerequisite to F. T. C. jurisdiction.

Respondent contends that the conspiracy as charged, began in the summer of 1932 and continued thereafter, save for the period of June 16, 1933 to May 27, 1935 when the N. R. A. Codes were in force. When the N. R. A. was declared unconstitutional in part, the agreement of these competitors again became illegal. This was in 1935 and the unlawful agreement or conspiracy continued thereafter. For sake of clarity, the important dates of this case are set forth chronologically in the margin.[1]

Some of the competitors engaged in this business, first associated together in a trade organization in April, 1919. This same organization incorporated in January, 1936, and was known as the Scientific Apparatus Makers of America, hereinafter referred to as SAMA. Its members manufactured or sold so many products that sub-associations, called sections, were formed, one being the Surveying-Drafting-Coaters Section, hereafter called the SDC Section, which section had forty members, among them the petitioners here involved. Most of the acts complained of were fostered and effected through this organization, with whom price lists were filed and at whose meetings the alleged agreements were reached for adherence to the prices filed.

The Federal Trade Commission filed its complaint against petitioners and many others, March 29, 1937, after which answers and motions to dismiss were filed. An extended hearing was had, stipulations between three of petitioners and the F. T. C. were filed, the F. T. C. made findings and a conclusion, and entered the cease and desist order here complained of, August 25, 1941.

The Federal Trade Commission found that representatives of seven to ten manufacturers met at Detroit in June or July, 1932, and agreed on a price list to become effective July 10, 1932, which price list Dietzgen had prepared, and which was "substantially higher than the demoralized prices at which sales were being made in Detroit at the time of this meeting." It also found that petitioners complied with the N. R. A. Code prices from November, 1933, to May 27, 1935, when the Supreme Court declared the pertinent part of the Act unconstitutional. In June of that year, the petitioners' representatives again met and agreed to keep the N. R. A. Code prices in effect, and in late October, 1935, they again met at Cleveland and concluded it was unfair to sell for less than the lowest published price of any member.[2] A Chicago meeting of June 1, 1936 came to the same agreement.[3] The Commission

---

[1] April, 1919 SAMA organized (not incorporated).

June or July, 1932 Representatives of seven manufacturers met at Hotel Statler in Detroit and allegedly agreed to adhere to certain price lists (beginning first conspiracy).

June 16, 1933 N. R. A. enacted.

June, 1933 S. D. C. Section of SAMA formed and SAMA enlarged membership and scope of activities.

July 28, 1933 Entered into reemployment agreement with President (Code prices under N. R. A.).

August 1, 1933 Code under N. R. A. submitted.

November 14, 1933 Code under N. R. A. approved by President.

Jan. 3, 1935 Schedule of prices filed with SAMA.

May 27, 1935 Supreme Court held N. R. A. partially unconstitutional and President immediately asked for voluntary compliance.

June 3, 1935 Meeting at Atlantic City (beginning of alleged second conspiracy).

Oct. 29, 1935 Meeting at Cleveland.

Jan. 20, 1936 SAMA incorporated in Illinois.

May 18, 1936 Identical bids to New York State.

June 1, 1936 Chicago meeting.

March 29, 1937 F. T. C. Complaint.

March 4, 1938 Dietzgen resigned from SAMA.

August 25, 1941 F. T. C. cease and desist order.

[2] "At this meeting rules of fair competition were adopted by unanimous vote of the members present, which, among other things, makes it unfair practice to:

" 'Sell, or offer to sell, products on which price information has been filed and published, at less than the lowest net price filed and published by any member on such product or products; nor sell, or offer to sell, special products, which are covered by his filed and published price lists, at net prices more favorable to the purchaser than the lowest filed and published net prices for a similar item of comparable grade.'

" 'To offer to consumers more favorable to them than "Net 30 days", nor more favorable terms to dealers than "2% cash discount on the 10th prox." '

" 'To take contracts for a period of more than one year, or allow options for an additional period or additional quantity of merchandise.' "

[3] "The practices described below were de-

found that prior to the Detroit meeting all petitioners were in substantial competition with each other, but such competition then ceased. The findings cite the fact that a majority of the eleven SDC section members submitted identical governmental bids in 19 instances, in sums varying from $3,441.20 to $34,095.50, and that mere coincidence or happenstance could not account for such constant recurrances and universality of identity.

The bids (by many members of the SDC Section) were made:

(1) To the State of New York, on May 18, 1936, in the sum of $18,721.48,[4] the members including Dietzgen, Keuffel, Bruning, and Keystone;

(2) To the Navy, in May, 1936, on nine separate lots, in which the bids were for thousands of dollars, and in which Dietzgen submitted identical bids with other members, on all nine lots; Keuffel and Pease, on eight of the nine lots; and Bruning on six of the lots;

(3) To the Navy, on July 1, 1937, there were eight lots in which identical bids of thousands of dollars were submitted by members, including Dietzgen's bid on all eight lots, Keuffel's bid on two lots, and Bruning on seven lots.

The conclusions which the F. T. C. drew from these identical bids were:

"While the illustrations above set out relate to reproduction papers only, the evidence establishes the same uniformity of prices on the other items sold by the respondents.

"Bids substantially identical in all instances and identical to the penny in most instances on various types of reproduction paper, where the quantity involved in the several lots ranges from $3,441.20 to $34,095.50, are not the result of a uniformity of the cost of production as contended by respondents but are the result of concerted action on the part of the respondents, as hereinabove found."

The F. T. C. reached the conclusion that a conspiracy was formulated (and later carried out) at the four meetings of the SDC Section and SAMA, held first in June, 1932, at Detroit, the second meeting at Atlantic City, in June, 1935, the third, in Cleveland, October, 1935, and the fourth, at Chicago, in June, 1936. Petitioners Bruning and Dietzgen attended all four of these meetings, Keuffel attended the second and fourth meetings, and Pease attended all but the first meeting.

Additional defenses to those outlined in the issues above stated are raised: i. e., the agreements as to price fixing, reached at the meetings of the Association never became effective and binding because never approved in accordance with the Association's rules. Dietzgen states it merely submitted its price list, in the first instance, somewhat like a declaration of policy that it was not participating in the then existing price war, and that it would not sell at prices which were below cost. Dietzgen also contends that since it resigned from SAMA on March 4, 1938, there was no need, as to it, for a cease and desist order, promulgated some three years after its resignation. Finally it is argued by petitioners that there was no injury to other competitors alleged or shown.

At the conclusion of the hearing before the Trial Examiner, extended and specific findings of fact were made which were assailed before the Commission and that body also made findings of fact and a conclusion which read

"Said understandings, agreements, combinations and conspiracies, and the things done thereunder and pursuant thereto and in furtherance thereof, as hereinabove found, constitute unfair methods of competition in commerce within the intent and

clared to be unfair and destructive to Industry welfare:

" 'Sell, or offer to sell, directly or indirectly, any product of the Section on which price information had been published, at less than the lowest net price published by any member on such product or products; nor sell, or offer to sell, products which are not covered by such price lists but which are similar to listed products, at net prices more favorable to the purchaser than the lowest published net price.'

"These rules also provide that:

" 'No member shall quote a lump-sum price on any schedule of products of this Industry which does not itemize, or which is lower than, the sum of such member's unit selling prices of the articles comprising the schedule; and when quoting a combined bid, including purchased materials, no member shall quote prices for such purchased material less than the published resale price of the manufacturer thereof applicable to the trade factor making the purchase. Any adjustment for units withdrawn must be at quoted prices.' "

[4] Keystone bid, $18,722.23.

meaning of the Federal Trade Commission Act."

The order which was entered directed the respondents to cease and desist from "fixing and maintaining, or agreeing to fix and maintain the prices at which said products will be sold by them." It directed Section SDC and certain members of the Executive Committee to cease and desist from "Directly or indirectly, jointly or severally, entering into or carrying out any understanding * * * to * * * suppress competition * * *" or "aiding and assisting the members of said respondent association in carrying out or engaging in any of the acts and practices hereinbefore set forth * * *."

It dismissed the complaint as to the respondents Scientific Apparatus Makers of America, its officer and directors, and respondents Carl S. Hallauer, R. E. Gillmor and John M. Roberts for want of evidence sufficient to establish the charges set forth in the complaint.

There were many respondents who were either members of the Association or particular individuals who opposed this relief, but all acquiesced in the order save only the petitioners here.

*Jurisdiction of the F. T. C. to Issue Cease and Desist Order against Activity within Purview of Sherman Act.* The contention

most seriously pressed by some, though not by all petitioners, to avoid the cease and desist order is the lack of power in the Federal Trade Commission to control a conspiracy to fix prices and create a monopoly, which admittedly could be reached under the Sherman Act. Or, stated differently, since this is a monopolistic conspiracy and within the scope of the Sherman Act, it should not be deemed to be an "unfair method of competition" and within the scope of the F. T. C.'s jurisdiction.

This argument is not a new one. It has been frequently advanced and text writers have dealt with and rejected it.[5]

We are satisfied that the F. T. C. was clearly within its jurisdiction in entering this order to cease price restrictions, provided the evidence sustained the charge. The Supreme Court has held that a method of price fixing, subject to criminal prosecution, under the Sherman Act, is also prohibitable under the F. T. C. Act. Likewise, its holding is unequivocal, that where parties dominate an industry and effect a price fixing agreement, such price fixing agreement is an "unfair method of competition." In the margin we quote from several of its decisions.[6]

Our conclusion is that instead of its being a ground for denying jurisdiction of the F. T. C., the fact that the acts com-

---

[5] Federal Trade Law and Practice, Henry Ward Beer, published in 1942, page 93, et seq.; Henderson, Federal Trade Commission, Chapter I.

[6] "If the purpose and practice of the combination of garment manufacturers and their affiliates runs counter to the public policy declared in the Sherman and Clayton Acts, the Federal Trade Commission has the power to suppress it as an unfair method of competition. From its findings the Commission concluded that the petitioners, 'pursuant to understandings, arrangements, agreements, combinations and conspiracies entered into jointly and severally', had prevented sales in interstate commerce, had 'substantially lessened, hindered and suppressed' competition, and had tended 'to create in themselves a monopoly.' * * * it was the object of the Federal Trade Commission Act to reach not merely in their fruition but also in their incipiency combinations which could lead to these (price fixing combinations) and other trade restraints and practices deemed undesirable. * * * While a conspiracy to fix prices is illegal, an intent to increase prices is not an ever-present essential of conduct amounting to a violation of the

policy of the Sherman and Clayton Acts; a monopoly contrary to their policies can exist even though a combination may temporarily or even permanently reduce the price of the articles manufactured or sold." Fashion Originators' Guild v. Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 706, 85 L.Ed. 949.

"The Sherman Act is not involved here except in so far as it shows a declaration of public policy to be considered in determining what are unfair methods of competition, which the Federal Trade Commission is empowered to condemn and suppress. * * *" Federal Trade Comm. v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 154, 66 L.Ed. 307, 19 A.L.R. 882.

"*The members of the associations dominate the paper trade in question.* They are organized to further common purposes * * *. Suggested prices for Idaho and Montana were sent out with the Spokane lists. There was an understanding that such prices would be followed. * * *

"The fact that there is no established rule that the lists shall be followed in taking orders for interstate shipments or that the quoting of lower prices is an infrac-

plained of, violate the criminal section of the Sherman Anti-Trust Act, affords a legitimate basis of action by the said Commission.

■ *No Competitor Was Hurt.* Hardly worthy of serious or extended consideration is petitioners' urge that the order should be set aside because no competitor was hurt by the practices and agreements. To carry this contention to its logical conclusion would necessitate denial to the Commission of jurisdiction to deal with any price fixing agreement to which all in the industry have subscribed. In other words, if this contention were accepted, it would only be when one or more competitors are left out or refuse to subscribe to the price-fixing agreement that the Federal Trade Commission could intervene. This would defeat the purpose of the Act. Price fixing usually results in price raising. That, and the elimination of price cutting, are the objects of such agreements. It is not often that any competitor in the industry is hurt by an agreement which raises the prices or an agreement which prevented the cutting of prices. The ordinary and necessary result would be financial advantage, at least temporary advantage to all in the industry. But it would not be to the advantage of the public or to the users of the commodities whose prices are fixed.

■ "Unfair methods of competition" are not determined by so narrow or one-sided a test. It is the harm, which results from destroying the *"fair opportunity"* for competition among competitors which results from a price fixing agreement, created and established by such combination, that makes the action unfair as that term is used in the Act. It is the restriction on the play of competition under normal conditions that presents a case of "unfair method of competition." Federal T. C. v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534; California Rice Industry v. Federal T. C., 9 Cir., 102 F.2d 716, 722.

■ *Sufficiency of the Evidence to Support the Commission's Findings.* The evidence not only supports the fact findings of the Commission as to the suppression of competition agreements, but it made any other finding impossible. No rational or satisfactory explanation is made of the testimony which showed that petitioners repeatedly made identical bids ranging from $3,441.20 to $34,095.50. To illustrate the similarity of such bids it may be said that on one occasion twelve bids of $23,211.76 were submitted on one lot, at another time, $23,488.11 was the bid submitted by each of thirteen bidders; at another, ten competitors each bid $5,767.74, while at still another time, thirteen bids, each for $3,441.20 were made; and on two other occasions twelve separate bids were, one for $6,692.75, and the other, for $6,112.44. These were but a few of the instances appearing in the record.

Equally conclusive was the record which showed the language of the rules of fair competition. The following is illustrative of practices condemned:

"Sell, or offer to sell, products on which price information has been filed and published at less than the lowest net price filed and published by any member on such product or products; nor sell, or offer to sell, special products which are not covered by his filed and published price list, at net prices more favorable to the purchaser than the lowest filed and published net price of a similar item of comparable grade."

---

tion for which complaint may be made is not controlling in favor of respondents. *An understanding, express or tacit, that the agreed prices will be followed is enough to constitute a transgression of the law. No provision to compel adherence is necessary.* * * *

"The use of the association prices by all the salesmen in making sales in interstate territories is not necessarily to be regarded as coincidence. There is ample ground for saying that such use results from the admitted combination. * * *

"Its (the Commission's) conclusion that the habitual use of the established list lessens competition and fixes prices in interstate territory cannot be said to be without sufficient support." Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 257, 71 L.Ed. 534.

See also: Millinery Creators' Guild v. Federal T. C., 2 Cir., 109 F.2d 175; Standard Oil Co. v. Federal T. C., 3 Cir., 282 F. 81, 87; Silver Co. v. Federal T. C., 6 Cir., 289 F. 985; Southern Hardware Jobbers Ass'n v. Federal T. C., 5 Cir., 290 F. 773, 779; Standard Container Mfrs' Ass'n v. Federal T. C., 5 Cir., 119 F.2d 262; National Harness Mfrs. Ass'n v. Federal T. C., 6 Cir., 268 F. 705; Chamber of Commerce v. Federal T. C., 8 Cir., 13 F.2d 673; Arkansas Wholesale Grocers' Ass'n v. Federal T. C., 8 Cir., 18 F.2d 866; Armand Co. v. Federal T. C., 2 Cir., 78 F.2d 707.

Addressing a section of the S. A. M. A. the Chairman of the Executive Committee, Mr. Keller said:

"Another benefit which our Section enjoyed under the N. R. A. is the Open Sales Price Policy. According to legal advice obtained by the Code Authority there is a way to maintain this system.

"Gentlemen, if you judge the future by your past experiences, I believe there is only one conclusion you can reach full-heartedly and that is to keep up our trade organization. There is only one way to do it, and I believe you will agree with me: We can work together only by living up to our present trade provisions as we have done in the past. In fact, every one of us will have to go a step further and take special precautions that no errors or mistakes slip through his organization. * * If you want to continue our trade cooperation, you must take the necessary precaution to avoid all and any mistakes. Either we live up to our present Code—if I may still use this word—100%—voluntarily—or we shall slide back to the old destructive competition. There is no half way.

"My final plea to you is: Let us voluntarily uphold our Code provisions 100%, and continue to compete on a friendly and fair basis. There is no agreement to this effect between us, either openly or implied, but under present conditions strong trade cooperation is essential to the interest of each and every member."

Another interesting and pertinent piece of evidence is a letter dated February 24, 1936, from Mr. Keller to the manager of S. A. M. A. concerning a member of the Association. This letter read:

"Information has reached us that the B. K. Elliott Co. of Pittsburgh are furnishing a 35% rag blueprint paper in 25 lb. weight. The tests we have made on their paper confirm that information.

"According to our trade Code and blueprint standards, such paper should not be sold as our trade standardized on a 24 lb. paper, either 25% rag or 50% rag.

"Furthermore, the B. K. Elliott Co. is selling the 35% rag paper at their standard price for a 25% rag paper.

"Please write to them, giving them the above information and ask them for an explanation."

Also supporting this conclusion is an occurrence quite unusual in proceedings of this nature.

When the time came to answer the complaint, S. A. M. A. and several individual respondents employed a Mr. Fisher, of Chicago, who filed answers for them wherein it was admitted that the allegations of the complaint filed by the F. T. C. were true. Mr. Fisher's statement is on file and in that statement he states he consulted with each respondent before he filed "confessing" answers and that said answers were all filed with the full and adequate authorization and consent of the said respondents. These answers were, however, later all withdrawn and "denial" answers substituted.

For the purpose of this review we ignore these admissions thus made, but observe that it is contrary to our experience to find counsel admitting charges of the kind here set forth in the complaint, for divers defendants, when such admissions are contrary to the facts or clients' instructions.

■ *Carrying Out the N. R. A. Code.* It is also argued with some emotion that petitioners were endeavoring to carry out the President's wishes and maintain prices and avoid competition of the cut-throat variety, so rampant in 1932 and 1933. This was the object of the N. R. A. and although the vital parts of the N. R. A. were stricken down [7] by the decision in Schechter Poultry Corp. v. United States, 295 U. S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, it was still a patriotic duty of all the competitors in this industry, so petitioners say, to do voluntarily what they could not be compelled to do legally.

There are at least three reasons why this argument must be rejected. First, and foremost, are the Sherman Anti-Trust Act and the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq. The teeth of the Sherman Act were drawn by the operation of the N. R. A. What was before illegal and criminal misconduct was not so under the N. R. A. The prohibitions against combinations in restraint of trade were lifted. When the N. R. A. was invalidated by judicial pronouncement of the Supreme Court, the Sherman Act and the F. T. C. Act again became unrestrainedly operative and their restrictions against com-

[7] By presidential order promulgated December 31, 1935, and effective January 1, 1936, the National Recovery Administration and the office of the Administrator were terminated. All activities relating to the National Recovery Administration were to terminate not later than April 1, 1936.

binations again governed industries engaged in interstate commerce.[8]

What was won by killing the N. R. A. was a reawakened or reborn Sherman Act and the F. T. C. Act. The Sherman Anti-Trust and the F. T. C. Act arose from the same grave in which the N. R. A. was buried.

Second, the N. R. A. permitted price fixing. In fact, it decreed price fixing. It is true, it was allegedly enacted to meet a temporary condition, an emergency, but even so, price stabilization was its objective and its result.

There was, however, one feature of the Act which must not be overlooked,—the public was represented in price fixing. By successfully assailing the N. R. A. the *government supervision* of the price fixing was eliminated. This result followed when the Act was stricken down. Then competitors proclaimed their willingness to abide by price fixing agreements, with public participation in the price fixing eliminated. Such a practice made the competitors the uncontrolled arbiters of their own prices. It was not a carrying out of the N. R. A. practice for an important part of the practice was eliminated.

Third. The defense must fail for the added reason that no official, whether he be the President or any other official, could lift the bar of either the Sherman Act or the F. T. C. Act. If the President made the request to maintain prices, they were wasted words, idle and impotent.[9]

The Sherman Act and the Federal Trade Act were the law of the land and governed petitioners and all others like them. No government official could suspend them.

Only through legislative enactment such as the N. R. A. could they be superseded. In short, petitioners cannot avoid liability for their actions because requested by some public official so to do. If such request could be shown it would have been of no more force than if spoken by a private citizen. Only Congress can lift the restrictions which find expression in the Sherman Act. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 227, 228, 60 S.Ct. 811, 84 L.Ed. 1129.

*Breadth of the Order.* Complaint is made that the *evidence* chiefly concerned itself with blue print paper and other reproduction papers and cloths, whereas the *order* covers a multitude of items [10] as to some of which there was little or no evidence. These items were all those enumerated in the complaint, except for two differences probably due to printing errors.

The Commission points out that the long list of products was incorporated in the Code approved under the N. R. A., and it is stipulated that the members of the Section distribute those products. The Commission also points out that "It is stipulated that the manager of the SDC Section determined, pursuant to the provisions of the Code, that it was the general practice of the members of the Section to sell their products on the basis of a published net price list or price list with discount sheets. This determination was not restricted to reproduction papers and cloths, but was in terms applicable to all Section products." These products were all listed in the Rules of Fair Competition adopted by the Section, in 1936, and the Rules (3.1) provided that it shall be an unfair practice to "sell,

---

[8] It may be argued that the N. R. A., being unconstitutional, never lifted the restrictions found in either anti-monopoly act. In other words the N. R. A. was ineffective for all purposes. We are convinced that notwithstanding this fact, the Government was estopped to prosecute citizens who complied with N. R. A. codes, for violations of either the Sherman Antitrust or the F. T. C. Acts, because the N. R. A. was presumably valid until by judicial pronouncement it was declared to be invalid, and in this case invalidity was not determined until its unconstitutionality was decreed by the Supreme Court.

[9] The fact that the President terminated the functions of all N. R. A. officials and Codes, negatives the idea that the Act was extended by executive order.

[10] "*   *   *   prepared tracing papers, tracing cloths, blueprint papers and cloths, other reproduction papers and cloths, profile and cross-section papers and cloths in sheets and rolls, coordinate papers—graph sheets (except ruled sheets) for engineering and drafting purposes, field books for engineers, drawing instruments, drawing tools (scales, triangles, T-squares, curves), draft machines, blueprinting machines and equipment, drawing boards and tables, filing cabinets for drawings and blueprints, lettering devices and lettering pens for the drafting profession, slide rules, planimeters and integrators, surveying instruments, surveying barometers, forestry instruments such as tree calipers, hypsometers, increment borers, current meters and water-stage registers, rods and poles for surveyors' use, tapes, chains and plumb bobs."

or offer to sell, directly or indirectly, *any product of the Section* on which price information has been published, at less than the lowest net price published by any member on such product or products."

The resolution adopted at the June, 1936, meeting provided for the filing of price terms of the products each member manufactured. It was not necessary to prove that the members followed the practice as to each product sold, when the general scheme is shown, and as here proof was presented as to some of the items. We can well assume, as the Commission did, that the scheme was meant to encompass all the products of this nature, manufactured by the members of the section, without detailed proof as to each item affected.[11]

Moreover, in view of the showing of general policy, of unwillingness of petitioners here, to correct their practices, save under compulsion of an effective order, it was appropriate if not compulsory for petitioners to propose to the F. T. C. that they would not fix prices in respect to other articles which they sell.

■ It is never proper or appropriate for the Commission to enjoin acts which were never committed nor threatened by the industry involved. Where, however, as here, the parties assume a role which leads to the conviction that they will continue to violate the provisions of the Federal Trade Commission Act and the Sherman Act and are doing so, the order to cease and desist should be broad and inclusive enough to *stop* the practices at once and for all time.

*Effect of Cessation of Practice Condemned by Order, Before Entry of Order.* Dietzgen Co. contends, separately and especially, that the order should not have been entered as to it because it resigned from SAMA on March 4, 1938.

A petitioner's discontinuance of acts which are subsequently found to be illegal, has been held not to bar the issuance of a cease and desist order.[12] It has also been so held in the analogous field of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.[13]

■ The propriety of the order to cease and desist, and the inclusion of a respondent therein, must depend on all the facts which include the attitude of respondent towards the proceedings, the sincerity of its practices and professions of desire to respect the law in the future and all other facts. Ordinarily the Commission should enter no order where none is necessary. This practice should include cases where the unfair practice has been discontinued.

■ On the other hand, parties who refused to discontinue the practice until proceedings are begun against them and proof of their wrongdoing obtained, occupy no position where they can demand a dismissal. The order to desist deals with the future, and we think it is somewhat a matter of sound discretion to be exercised

11 United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Socony-Vacuum Co., supra; N. L. R. B. v. Express Pub. Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930; Fashion Originators' Guild v. Federal T. C., supra.

12 "But mere discontinuance of unfair competitive methods, however, is no defense. Federal Trade Comm. v. Wallace [8 Cir.], 75 F.2d 733, 738; Butterick Co. v. Federal Trade Comm. [2 Cir.], 4 F.2d 910; Fox Film Corp. v. Federal Trade Comm. [2 Cir.], 296 F. 353; Guarantee Veterinary Co. v. Federal Trade Comm. [2 Cir.], 285 F. 853." Armand Co. v. Federal T. C., 2 Cir., 78 F.2d 707, 708.

"The discontinuance of the practice claimed by the Commission to be illegal, even though it is not a bar to a Commission proceeding, might well be and has on some occasions been, considered by the Commission as sufficient reason to dismiss a complaint especially where there is no reason to believe the practice will be resumed." Federal Trade Law and Practice, Beer, page 198.

See also Bunte Bros. v. Federal T. C., 7 Cir., 104 F.2d 996; Federal T. C. v. A. McLean & Son, 7 Cir., 84 F.2d 910; Holloway & Co. v. Federal T. C., 299 U. S. 590, 57 S.Ct. 117, 81 L.Ed. 435; Fairyfoot Products Co. v. Federal T. C., 7 Cir., 80 F.2d 684; Arkansas Wholesale Grocers' Ass'n v. Federal T. C., 8 Cir., 18 F.2d 866; Chamber of Commerce v. Federal T. C., 8 Cir., 13 F.2d 673; Fox Film Corp. v. Federal T. C., 2 Cir., 296 F. 353; Sears, Roebuck & Co. v. Federal T. C., 7 Cir., 258 F. 307, 6 A.L.R. 358; Hershey Chocolate Corp. v. Federal T. C., 3 Cir., 121 F.2d 968; Perma-Maid Co. v. Federal T. C., 7 Cir., 121 F.2d 282; National Silver Co. v. Federal T. C., 2 Cir., 88 F.2d 425.

13 Pueblo Gas & Fuel Co. v. N. L. R. B., 10 Cir., 118 F.2d 304; N. L. R. B. v. Gerling Furniture Co., 7 Cir., 103 F.2d 663; N. L. R. B. v. Burke Mach. Tool Co., 6 Cir., 133 F.2d 618.

wisely by the Commission—when it comes to entering its order.

The object of the proceeding is to *stop* the unfair practice. If the practice has been surely stopped and by the act of the party offending, the object of the proceedings having been attained, no order is necessary, nor should one be entered. If, however, the action of the wrongdoer does not insure a cessation of the practice in the future, the order to desist is appropriate. We are not satisfied that the Commission abused that discretion in the instant case.

*In Re Motion for Leave to Adduce Additional Evidence Before Commission.* There was filed by petitioner Bruning, a motion for leave to adduce additional evidence before the Commission, which motion was denied without prejudice to renew the same. The motion was renewed at the time of the oral argument. In brief, the motion states that petitioner, if the cease and desist order be approved by us, will be placed in the dilemma of violating the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 925 et seq.

The Commission argues that this court takes judicial notice that the Emergency Price Control Act was enacted after the Commission's order was entered and therefore can have no effect upon its finding of the existence of a conspiracy.

The Commission goes further, and in a commendable effort to iron out this superficial conflict of jurisdiction, wrote to the General Counsel of the Office of Price Administration and specifically presented all the facts to him, and received a definite and specific reply that there was no conflict between the two Acts, or the administrative practice thereunder. In other words, under the Price Control Act, a maximum is set for each seller and not for the industry at large, and that it was the purpose of the latter Act to foster competition in the hope that inflation would be avoided or deterred.

▆▆▆ Petitioners may not be successfully prosecuted for a violation of the F. T. C.'s cease and desist order, where the Commission's order is subject to any valid order or action under the Emergency Price Control Act.

The motion for leave to adduce additional evidence is denied.

Other questions raised by petitioners we have considered but do not deem them of such importance as to require special consideration.

Petitioners, Keuffel & Esser Company and Karl Keller, upon petition for rehearing, insist that their position differs from that of the other petitioners and we have not given it proper consideration. They say they did not take the legal positions which the other petitioners took and they assert that the evidence, as against them, fails to show any guilty participation in unfair trade practices such as are charged by the Federal Trade Commission.

We agree that their position differs from that taken by the others, both as to facts and as to the legal questions they raise. We have given their argument further consideration but are unable to change our conclusions.

▆▆▆ The fact that these petitioners did not join the combination to restrain trade and fix prices and eliminate competition, when the others first acted, does not relieve them of liability, if in fact they subsequently joined with the others and helped effectuate the unfair trade practices by eliminating competition. Allen v. United States, 7 Cir., 4 F.2d 688.

▆▆▆ The evidence justifies the finding that these petitioners participated in the illegal practices by adhering to the prices which their competitors fixed and agreed upon. One may be liable regardless of when he joins the unlawful trade practices.

Where numerous competitors fixed the prices which they agree to maintain, and another competitor, not a party to the agreement originally, adopts the schedule and makes his prices agree, to the last penny, as the petitioners did, with the prices which the competitors fixed and charged, he can not avoid responsibility for his action even though he be less active in the first instance, or because his subsequent action was without affirmative, express agreement on his part to maintain the prices fixed by the others.

▆▆▆ We must look to the substance and not to the form of the conspirators' conduct. We do not think that affirmative, positive, express agreement to maintain prices is essential to establish unfair trade practices. If the parties clearly and intentionally maintain the prices, even though without express agreement, they are liable. In such a situation their action may fall within the prohibition of the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq. An artificial price level not related to the supply and demand in a given commodity,

332

may evidence concerted action of sellers operating to restrain commerce. That is what the evidence here shows.

 The rule stated in Interstate Circuit v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610, and United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 1076, 86 L.Ed. 1461, applies here. "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish unlawful conspiracy under the Sherman Act." It is also sufficient to establish unfair methods of competition under the F. T. C. act.

The order of the Commission is approved. Counsel for respondent will draw a proposed order and submit it to petitioners, pursuant to the rule of this court respecting the drafting of orders in cases where appeal is taken from a ruling of an Administrative Board. In such order, respondent is directed to modify its order and make it clear that the cease and desist order enjoins petitioners from doing any of the acts or things condemned *pursuant* to any agreement, combination or conspiracy here found to exist.